## WHITNEY *v.* CALIFORNIA.

ERROR TO THE DISTRICT COURT OF APPEAL, FIRST APPELLATE DISTRICT, DIVISION ONE, OF THE STATE OF CALIFORNIA.

No. 3. Argued October 6, 1925; reargued March 18, 1926.—Decided May 16, 1927.

1. This Court acquires no jurisdiction to review the judgment of a state court of last resort on a writ of error, unless it affirmatively appears on the face of the record that a federal question constituting an appropriate ground for such review was presented in and expressly or necessarily decided by such state court. P. 360.

2. Where the fact that a federal question was considered and passed upon by the state court does not appear by the record, it may be shown by a certified copy of an order of that court made after the return of the writ of error and brought here as an addition to the record. P. 361.

3. In reviewing the judgment of a state court this Court will consider only such federal questions as are shown to have been presented to the state court and expressly or necessarily decided by it. P. 362.

4. The question whether the petitioner, who joined and assisted in the organization of a Communist Labor Party contravening the California Criminal Syndicalism Act, did so with knowledge of its unlawful character and purpose, was a mere question of the weight of the evidence, foreclosed by the verdict of guilty approved by the state court, and not a question of the constitutionality of the Act, reviewable by this Court. P. 366.

5. The California Criminal Syndicalism Act, which defines "criminal syndicalism" as "any doctrine or precept advocating, teaching

or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning wilful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change," and declares guilty of a felony any person who "organizes or assists in organizing, or is or knowingly becomes a member of, any organization, society, group or assemblage of persons organized or assembled to advocate, teach or aid and abet criminal syndicalism," is sufficiently clear and explicit to satisfy the requirement of due process of law.  P. 368.

6. The statute does not violate the Equal Protection Clause of the Fourteenth Amendment in penalizing those who advocate a resort to violent and unlawful methods as a means of changing industrial and political conditions while not penalizing those who may advocate a resort to such methods for maintaining such conditions, since the distinction is not arbitrary but within the discretionary power of the State to direct its legislation against what it deems an evil without covering the whole field of possible abuses.  P. 369.

7. Such a statute is not open to objection unless the classification on which it is based is so lacking in any adequate or reasonable basis as to preclude the assumption that it was made in the exercise of the legislative judgment and discretion.  P. 369.

8. This Act is not class legislation; it affects all alike, no matter what their business associations or callings, who come within its terms and do the things prohibited.  P. 370.

9. Nor is it repugnant to the Due Process Clause as a restraint of the rights of free speech, assembly, and association.  P. 371.

10. The determination of the legislature that the acts defined involve such danger to the public peace and security of the State that they should be penalized in the exercise of the police power must be given great weight and every presumption be indulged in favor of the validity of the statute, which could be declared unconstitutional only if an attempt to exercise arbitrarily and unreasonably the authority vested in the State in the public interest.  P. 371.

57 Cal. App. 449; ib. 453, affirmed.

ERROR to a judgment of the District Court of Appeal of California which affirmed a conviction of the petitioner under the state act against criminal syndicalism.  The Supreme Court of California denied a petition for appeal. On the first hearing in this Court the writ of error was

dismissed for want of jurisdiction, but later a petition for rehearing was granted. 269 U. S. 530, 538.

*Mr. Walter H. Pollak,* with whom *Messrs. John F. Neylan, Thomas L. Lennon, Walter Nelles,* and *Ruth I. Wilson* were on the brief, for plaintiff in error.

*Mr. John H. Riordan,* Deputy Attorney General of California, with whom *Mr. U. S. Webb,* Attorney General, was on the brief, for the State of California.

MR. JUSTICE SANFORD delivered the opinion of the Court.

By a criminal information filed in the Superior Court of Alameda County, California, the plaintiff in error was charged, in five counts, with violations of the Criminal Syndicalism Act of that State. Statutes, 1919, c. 188, p. 281. She was tried, convicted on the first count, and sentenced to imprisonment. The judgment was affirmed by the District Court of Appeal. 57 Cal. App. 449. Her petition to have the case heard by the Supreme Court [1] was denied. *Ib.* 453. And the case was brought here on a writ of error which was allowed by the Presiding Justice of the Court of Appeal, the highest court of the State in which a decision could be had. Jud. Code, § 237.

On the first hearing in this Court, the writ of error was dismissed for want of jurisdiction. 269 U. S. 530. Thereafter, a petition for rehearing was granted, *Ib.* 538; and the case was again heard and reargued both as to the jurisdiction and the merits.

The pertinent provisions of the Criminal Syndicalism Act are:

"Section 1. The term 'criminal syndicalism' as used in this act is hereby defined as any doctrine or precept advocating, teaching or aiding and abetting the commis-

---

[1] Statutes, 1919, c. 58, p. 88.

sion of crime, sabotage (which word is hereby defined as meaning wilful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change.

"Sec. 2. Any person who: . . . . 4. Organizes or assists in organizing, or is or knowingly becomes a member of, any organization, society, group or assemblage of persons organized or assembled to advocate, teach or aid and abet criminal syndicalism . . .

"Is guilty of a felony and punishable by imprisonment."

The first count of the information, on which the conviction was had, charged that on or about November 28, 1919, in Alameda County, the defendant, in violation of the Criminal Syndicalism Act, "did then and there unlawfully, wilfully, wrongfully, deliberately and feloniously organize and assist in organizing, and was, is, and knowingly became a member of an organization, society, group and assemblage of persons organized and assembled to advocate, teach, aid and abet criminal syndicalism."

It has long been settled that this Court acquires no jurisdiction to review the judgment of a state court of last resort on a writ of error, unless it affirmatively appears on the face of the record that a federal question constituting an appropriate ground for such review was presented in and expressly or necessarily decided by such state court. *Crowell* v. *Randell*, 10 Pet. 368, 392; *Railroad Co.* v. *Rock*, 4 Wall, 177, 180; *California Powder Works* v. *Davis*, 151 U. S. 389, 393; *Cincinnati, etc. Railway* v. *Slade*, 216 U. S. 78, 83; *Hiawassee Power Co.* v. *Carolina-Tenn. Co.*, 252 U. S. 341, 343; *New York* v. *Kleinert*, 268 U. S. 646, 650.

Here the record does not show that the defendant raised or that the State courts considered or decided any

Federal question whatever, excepting as appears in an order made and entered by the Court of Appeal after it had decided the case and the writ of error had issued and been returned to this Court. A certified copy of that order, brought here as an addition to the record, shows that it was made and entered pursuant to a stipulation of the parties, approved by the court, and that it contains the following statement:

"The question whether the California Criminal Syndicalism Act . . . and its application in this case is repugnant to the provisions of the Fourteenth Amendment to the Constitution of the United States, providing that no state shall deprive any person of life, liberty, or property, without due process of law, and that all persons shall be accorded the equal protection of the laws, was considered and passed upon by this Court."

In *Cincinnati Packet Co.* v. *Bay*, 200 U. S. 179, 182, where it appeared that a federal question had been presented in a petition in error to the State Supreme Court in a case in which the judgment was affirmed without opinion, it was held that the certificate of that court to the effect that it had considered and necessarily decided this question, was sufficient to show its existence. And see *Marvin* v. *Trout*, 199 U. S. 212, 217, *et seq.; Consolidated Turnpike* v. *Norfolk, etc. Railway*, 228 U. S. 596, 599.

So—while the unusual course here taken to show that federal questions were raised and decided below is not to be commended—we shall give effect to the order of the Court of Appeal as would be done if the statement had been made in the opinion of that court when delivered. See *Gross* v. *United States Mortgage Co.*, 108 U. S. 477, 484–486; *Philadelphia Fire Association* v. *New York*, 119 U. S. 110, 116; *Home for Incurables* v. *City of New York*, 187 U. S. 155, 157; *Land & Water Co.* v. *San Jose Ranch Co.*, 189 U. S. 177, 179–180; *Rector* v. *City Deposit Bank*,

200 U. S. 405, 412; *Haire* v. *Rice*, 204 U. S. 291, 299; *Chambers* v. *Baltimore, etc. Railroad*, 207 U. S. 142, 148; *Atchison, etc. Railway* v. *Sowers*, 213 U. S. 55, 62; *Consolidated Turnpike Co.* v. *Norfolk, etc. Railway*, 228 U. S. 596, 599; *Miedreich* v. *Lauenstein*, 232 U. S. 236, 242; *North Carolina Railroad* v. *Zachary*, 232 U. S. 248, 257; *Chicago, etc. Railway* v. *Perry*, 259 U. S. 548, 551.

And here, since it appears from the statement in the order of the Court of Appeal that the question whether the Syndicalism Act and its application in this case was repugnant to the due process and equal protection clauses of the Fourteenth Amendment, was considered and passed upon by that court—this being a federal question constituting an appropriate ground for a review of the judgment—we conclude that this Court has acquired jurisdiction under the writ of error. The order dismissing the writ for want of jurisdiction will accordingly be set aside.

We proceed to the determination, upon the merits, of the constitutional question considered and passed upon by the Court of Appeal. Of course our review is to be confined to that question, since it does not appear, either from the order of the Court of Appeal or from the record otherwise, that any other federal question was presented in and either expressly or necessarily decided by that court. *National Bank* v. *Commonwealth*, 9 Wall. 353, 363; *Edwards* v. *Elliott*, 21 Wall. 532, 557; *Dewey* v. *Des Moines*, 173 U. S. 193, 200; *Keokuk & Hamilton Bridge Co.* v. *Illinois*, 175 U. S. 626, 633; *Capital City Dairy Co.* v. *Ohio*, 183 U. S. 238, 248; *Haire* v. *Rice*, 204 U. S. 291, 301; *Selover, Bates & Co.* v. *Walsh*, 226 U. S. 112, 126. *Missouri Pacific Railway* v. *Coal Co.*, 256 U. S. 134, 135. It is not enough that there may be somewhere hidden in the record a question which, if it had been raised, would have been of a federal nature. *Dewey* v. *Des Moines, supra*, 199; *Keokuk & Hamilton Bridge Co.* v. *Illinois, supra*, 634. And this necessarily excludes from our con-

sideration a question sought to be raised for the first time by the assignments of error here—not presented in or passed upon by the Court of Appeal—whether apart from the constitutionality of the Syndicalism Act, the judgment of the Superior Court, by reason of the rulings of that court on questions of pleading, evidence and the like, operated as a denial to the defendant of due process of law. *See Oxley Stave Co.* v. *Butler County,* 166 U. S. 648, 660; *Capital City Dairy Co.* v. *Ohio, supra,* 248; *Manhattan Life Ins. Co.* v. *Cohen,* 234 U. S. 123, 134; *Bass, etc. Ltd.* v. *Tax Commission,* 266 U. S. 271, 283.

The following facts, among many others, were established on the trial by undisputed evidence: The defendant, a resident of Oakland, in Alameda County, California, had been a member of the Local Oakland branch of the Socialist Party. This Local sent delegates to the national convention of the Socialist Party held in Chicago in 1919, which resulted in a split between the "radical" group and the old-wing Socialists. The "radicals"—to whom the Oakland delegates adhered—being ejected, went to another hall, and formed the Communist Labor Party of America. Its Constitution provided for the membership of persons subscribing to the principles of the Party and pledging themselves to be guided by its Platform, and for the formation of state organizations conforming to its Platform as the supreme declaration of the Party. In its "Platform and Program" the Party declared that it was in full harmony with "the revolutionary working class parties of all countries" and adhered to the principles of Communism laid down in the Manifesto of the Third International at Moscow, and that its purpose was "to create a unified revolutionary working class movement in America," organizing the workers as a class, in a revolutionary class struggle to conquer the capitalist state, for the overthrow of capitalist rule, the conquest of political power and the establishment

of a working class government, the Dictatorship of the Proletariat, in place of the state machinery of the capitalists, which should make and enforce the laws, reorganize society on the basis of Communism and bring about the Communist Commonwealth—advocated, as the most important means of capturing state power, the action of the masses, proceeding from the shops and factories, the use of the political machinery of the capitalist state being only secondary; the organization of the workers into "revolutionary industrial unions"; propaganda pointing out their revolutionary nature and possibilities; and great industrial battles showing the value of the strike as a political weapon—commended the propaganda and example of the Industrial Workers of the World and their struggles and sacrifices in the class war—pledged support and cooperation to "the revolutionary industrial proletariat of America" in their struggles against the capitalist class—cited the Seattle and Winnipeg strikes and the numerous strikes all over the country "proceeding without the authority of the old reactionary Trade Union officials," as manifestations of the new tendency—and recommended that strikes of national importance be supported and given a political character, and that propagandists and organizers be mobilized "who can not only teach, but actually help to put in practice the principles of revolutionary industrial unionism and Communism."

Shortly thereafter the Local Oakland withdrew from the Socialist Party, and sent accredited delegates, including the defendant, to a convention held in Oakland in November, 1919, for the purpose of organizing a California branch of the Communist Labor Party. The defendant, after taking out a temporary membership in the Communist Labor Party, attended this convention as a delegate and took an active part in its proceedings. She was elected a member of the Credentials Committee, and, as its chairman, made a report to the convention upon

which the delegates were seated. She was also appointed a member of the Resolutions Committee, and as such signed the following resolution in reference to political action, among others proposed by the Committee: "The C. L. P. of California fully recognizes the value of political action as a means of spreading communist propaganda; it insists that in proportion to the development of the economic strength of the working class, it, the working class, must also develop its political power. The C. L. P. of California proclaims and insists that the capture of political power, locally or nationally by the revolutionary working class can be of tremendous assistance to the workers in their struggle of emancipation. Therefore, we again urge the workers who are possessed of the right of franchise to cast their votes for the party which represents their immediate and final interest—the C. L. P.—at all elections, being fully convinced of the utter futility of obtaining any real measure of justice or freedom under officials elected by parties owned and controlled by the capitalist class." The minutes show that this resolution, with the others proposed by the committee, was read by its chairman to the convention before the Committee on the Constitution had submitted its report. According to the recollection of the defendant, however, she herself read this resolution. Thereafter, before the report of the Committee on the Constitution had been acted upon, the defendant was elected an alternate member of the State Executive Committee. The Constitution, as finally read, was then adopted. This provided that the organization should be named the Communist Labor Party of California; that it should be "affiliated with" the Communist Labor Party of America, and subscribe to its Program, Platform and Constitution, and "through this affiliation" be "joined with the Communist International of Moscow;" and that the qualifications for membership should be those prescribed in the

National Constitution. The proposed resolutions were later taken up and all adopted, except that on political action, which caused a lengthy debate, resulting in its defeat and the acceptance of the National Program in its place. After this action, the defendant, without, so far as appears, making any protest, remained in the convention until it adjourned. She later attended as an alternate member one or two meetings of the State Executive Committee in San José and San Francisco, and stated, on the trial, that she was then a member of the Communist Labor Party. She also testified that it was not her intention that the Communist Labor Party of California should be an instrument of terrorism or violence, and that it was not her purpose or that of the Convention to violate any known law.

In the light of this preliminary statement, we now take up, in so far as they require specific consideration, the various grounds upon which it is here contended that the Syndicalism Act and its application in this case is repugnant to the due process and equal protection clauses of the Fourteenth Amendment.

1. While it is not denied that the evidence warranted the jury in finding that the defendant became a member of and assisted in organizing the Communist Labor Party of California, and that this was organized to advocate, teach, aid or abet criminal syndicalism as defined by the Act, it is urged that the Act, as here construed and applied, deprived the defendant of her liberty without due process of law in that it has made her action in attending the Oakland convention unlawful by reason of "a subsequent event brought about against her will, by the agency of others," with no showing of a specific intent on her part to join in the forbidden purpose of the association, and merely because, by reason of a lack of "prophetic" understanding she failed to foresee the quality that others would give to the convention. The argu-

ment is, in effect, that the character of the state organization could not be forecast when she attended the convention; that she had no purpose of helping to create an instrument of terrorism and violence; that she "took part in formulating and presenting to the convention a resolution which, if adopted, would have committed the new organization to a legitimate policy of political reform by the use of the ballot"; that it was not until after the majority of the convention turned out to be "contrary-minded, and other less temperate policies prevailed" that the convention could have taken on the character of criminal syndicalism; and that as this was done over her protest, her mere presence in the convention, however violent the opinions expressed therein, could not thereby become a crime. This contention, while advanced in the form of a constitutional objection to the Act, is in effect nothing more than an effort to review the weight of the evidence for the purpose of showing that the defendant did not join and assist in organizing the Communist Labor Party of California with a knowledge of its unlawful character and purpose. This question, which is foreclosed by the verdict of the jury—sustained by the Court of Appeal over the specific objection that it was not supported by the evidence—is one of fact merely which is not open to review in this Court, involving as it does no constitutional question whatever. And we may add that the argument entirely disregards the facts: that the defendant had previously taken out a membership card in the National Party, that the resolution which she supported did not advocate the use of the ballot to the exclusion of violent and unlawful means of bringing about the desired changes in industrial and political conditions; and that, after the constitution of the California Party had been adopted, and this resolution had been voted down and the National Program accepted, she not only remained in the convention, without

protest, until its close, but subsequently manifested her acquiescence by attending as an alternate member of the State Executive Committee and continuing as a member of the Communist Labor Party.

2. It is clear that the Syndicalism Act is not repugnant to the due process clause by reason of vagueness and uncertainty of definition. It has no substantial resemblance to the statutes held void for uncertainty under the Fourteenth and Fifth Amendments in *International Harvester Co.* v. *Kentucky,* 234 U. S. 216, 221; and *United States* v. *Cohen Grocery,* 255 U. S. 81, 89, because not fixing an ascertainable standard of guilt. The language of § 2, subd. 4, of the Act, under which the plaintiff in error was convicted, is clear; the definition of " criminal syndicalism " specific.

The Act, plainly, meets the essential requirement of due process that a penal statute be " sufficiently explicit to inform those who are subject to it, what conduct on their part will render them liable to its penalties," and be couched in terms that are not " so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally* v. *General Construction Co.,* 269 U. S. 385, 391. And see *United States* v. *Brewer,* 139 U. S. 278, 288; *Chicago, etc., Railway* v. *Dey,* (C. C.) 35 Fed. 866, 876; *Tozer* v. *United States,* (C. C.) 52 Fed. 917, 919. In *Omaechevarria* v. *Idaho,* 246 U. S. 343, 348, in which it was held that a criminal statute prohibiting the grazing of sheep on any " range " previously occupied by cattle " in the usual and customary use " thereof, was not void for indefiniteness because it failed to provide for the ascertainment of the boundaries of a " range " or to determine the length of time necessary to constitute a prior occupation a " usual " one, this Court said: " Men familiar with range conditions and desirous of observing the law will have little difficulty

in determining what is prohibited by it. Similar expressions are common in the criminal statutes of other States. This statute presents no greater uncertainty or difficulty, in application to necessarily varying facts, than has been repeatedly sanctioned by this court. *Nash* v. *United States,* 229 U. S. 373, 377; *Miller* v. *Strahl,* 239 U. S. 426, 434." So, as applied here, the Syndicalism Act required of the defendant no " prophetic " understanding of its meaning.

And similar Criminal Syndicalism statutes of other States, some less specific in their definitions, have been held by the State courts not to be void for indefiniteness. *State* v. *Hennessy,* 114 Wash. 351, 364; *State* v. *Laundy,* 103 Ore. 443, 460; *People* v. *Ruthenberg,* 229 Mich. 315, 325. And see *Fox* v. *Washington,* 236 U. S. 273, 277; *People* v. *Steelik,* 187 Cal. 361, 372; *People* v. *Lloyd,* 304 Ill. 23, 34.

3. Neither is the Syndicalism Act repugnant to the equal protection clause, on the ground that, as its penalties are confined to those who advocate a resort to violent and unlawful methods as a means of changing industrial and political conditions, it arbitrarily discriminates between such persons and those who may advocate a resort to these methods as a means of maintaining such conditions.

It is settled by repeated decisions of this Court that the equal protection clause does not take from a State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary; and that one who assails the classification must carry the burden of showing that, it does not rest upon any reasonable basis, but is essentially arbitrary. *Lindsley* v. *National Carbonic Gas Co.,* 220 U. S. 61, 78, and cases cited.

A statute does not violate the equal protection clause merely because it is not all-embracing. *Zucht* v. *King,* 260 U. S. 174, 177; *James-Dickinson Farm Mortgage Co.* v. *Harry,* 273 U. S. 119. A State may properly direct its legislation against what it deems an existing evil without covering the whole field of possible abuses. *Patsone* v. *Pennsylvania,* 232 U. S. 138, 144; *Farmers Bank* v. *Federal Reserve Bank,* 262 U. S. 649, 661; *James-Dickinson Mortgage Co.* v. *Harry, supra.* The statute must be presumed to be aimed at an evil where experience shows it to be most felt, and to be deemed by the legislature coextensive with the practical need; and is not to be overthrown merely because other instances may be suggested to which also it might have been applied; that being a matter for the legislature to determine unless the case is very clear. *Keokee Coke Co.* v. *Taylor,* 234 U. S. 224, 227. And it is not open to objection unless the classification is so lacking in any adequate or reasonable basis as to preclude the assumption that it was made in the exercise of the legislative judgment and discretion. *Stebbins* v. *Riley,* 268 U. S. 137, 143; *Graves* v. *Minnesota,* 272 U. S. 425; *Swiss Oil Corporation* v. *Shanks,* 273 U. S. 407.

The Syndicalism Act is not class legislation; it affects all alike, no matter what their business associations or callings, who come within its terms and do the things prohibited. See *State* v. *Hennessy, supra,* 361; *State* v. *Laundy, supra,* 460. And there is no substantial basis for the contention that the legislature has arbitrarily or unreasonably limited its application to those advocating the use of violent and unlawful methods to effect changes in industrial and political conditions; there being nothing indicating any ground to apprehend that those desiring to maintain existing industrial and political conditions did or would advocate such methods. That there is a wide-spread conviction of the necessity for legislation of

this character is indicated by the adoption of similar statutes in several other States.

4. Nor is the Syndicalism Act as applied in this case repugnant to the due process clause as a restraint of the rights of free speech, assembly, and association.

That the freedom of speech which is secured by the Constitution does not confer an absolute right to speak, without responsibility, whatever one may choose, or an unrestricted and unbridled license giving immunity for every possible use of language and preventing the punishment of those who abuse this freedom; and that a State in the exercise of its police power may punish those who abuse this freedom by utterances inimical to the public welfare, tending to incite to crime, disturb the public peace, or endanger the foundations of organized government and threaten its overthrow by unlawful means, is not open to question. *Gitlow v. New York,* 268 U. S. 652, 666-668, and cases cited.

By enacting the provisions of the Syndicalism Act the State has declared, through its legislative body, that to knowingly be or become a member of or assist in organizing an association to advocate, teach or aid and abet the commission of crimes or unlawful acts of force, violence or terrorism as a means of accomplishing industrial or political changes, involves such danger to the public peace and the security of the State, that these acts should be penalized in the exercise of its police power. That determination must be given great weight. Every presumption is to be indulged in favor of the validity of the statute, *Mugler v. Kansas,* 123 U. S. 623, 661; and it may not be declared unconstitutional unless it is an arbitrary or unreasonable attempt to exercise the authority vested in the State in the public-interest. *Great Northern Railway v. Clara City,* 246 U. S. 434, 439.

The essence of the offense denounced by the Act is the combining with others in an association for the ac-

complishment of the desired ends through the advocacy and use of criminal and unlawful methods. It partakes of the nature of a criminal conspiracy. See *People* v. *Steelik, supra,* 376. That such united and joint action involves even greater danger to the public peace and security than the isolated utterances and acts of individuals, is clear. We cannot hold that, as here applied, the Act is an unreasonable or arbitrary exercise of the police power of the State, unwarrantably infringing any right of free speech, assembly or association, or that those persons are protected from punishment by the due process clause who abuse such rights by joining and furthering an organization thus menacing the peace and welfare of the State.

We find no repugnancy in the Syndicalism Act as applied in this case to either the due process or equal protection clauses of the Fourteenth Amendment on any of the grounds upon which its validity has been here challenged.

The order dismissing the writ of error will be vacated and set aside, and the judgment of the Court of Appeal

*Affirmed.*

Mr. Justice Brandeis, concurring.

Miss Whitney was convicted of the felony of assisting in organizing, in the year 1919, the Communist Labor Party of California, of being a member of it, and of assembling with it. These acts are held to constitute a crime, because the party was formed to teach criminal syndicalism. The statute which made these acts a crime restricted the right of free speech and of assembly theretofore existing. The claim is that the statute, as applied, denied to Miss Whitney the liberty guaranteed by the Fourteenth Amendment.

The felony which the statute created is a crime very unlike the old felony of conspiracy or the old misdemeanor

of unlawful assembly. The mere act of assisting in forming a society for teaching syndicalism, of becoming a member of it, or of assembling with others for that purpose is given the dynamic quality of crime. There is guilt although the society may not contemplate immediate promulgation of the doctrine. Thus the accused is to be punished, not for contempt, incitement or conspiracy, but for a step in preparation, which, if it threatens the public order at all, does so only remotely. The novelty in the prohibition introduced is that the statute aims, not at the practice of criminal syndicalism, nor even directly at the preaching of it, but at association with those who propose to preach it.

Despite arguments to the contrary which had seemed to me persuasive, it is settled that the due process clause of the Fourteenth Amendment applies to matters of substantive law as well as to matters of procedure. Thus all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States. The right of free speech, the right to teach and the right of assembly are, of course, fundamental rights. See *Meyer* v. *Nebraska,* 262 U. S. 390; *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Gitlow* v. *New York,* 268 U. S. 652, 666; *Farrington* v. *Tokushige,* 273 U. S. 284. These may not be denied or abridged. But, although the rights of free speech and assembly are fundamental, they are not in their nature absolute. Their exercise is subject to restriction, if the particular restriction proposed is required in order to protect the State from destruction or from serious injury, political, economic or moral. That the necessity which is essential to a valid restriction does not exist unless speech would produce, or is intended to produce, a clear and imminent danger of some substantive evil which the State constitutionally may seek to prevent has been settled. See *Schenck* v. *United States,* 249 U. S. 47, 52.

It is said to be the function of the legislature to determine whether at a particular time and under the particular circumstances the formation of, or assembly with, a society organized to advocate criminal syndicalism constitutes a clear and present danger of substantive evil; and that by enacting the law here in question the legislature of California determined that question in the affirmative. Compare *Gitlow* v. *New York,* 268 U. S. 652, 668–671. The legislature must obviously decide, in the first instance, whether a danger exists which calls for a particular protective measure. But where a statute is valid only in case certain conditions exist, the enactment of the statute cannot alone establish the facts which are essential to its validity. Prohibitory legislation has repeatedly been held invalid, because unnecessary, where the denial of liberty involved was that of engaging in a particular business.[1] The power of the courts to strike down an offending law is no less when the interests involved are not property rights, but the fundamental personal rights of free speech and assembly.

This Court has not yet fixed the standard by which to determine when a danger shall be deemed clear; how remote the danger may be and yet be deemed present; and what degree of evil shall be deemed sufficiently substantial to justify resort to abridgement of free speech and assembly as the means of protection. To reach sound conclusions on these matters, we must bear in mind why a State is, ordinarily, denied the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence.

---

[1] Compare *Frost* v. *R. R. Comm. of California,* 271 U. S. 583; *Weaver* v. *Palmer Bros. Co.,* 270 U. S. 402; *Jay Burns Baking Co.* v. *Bryan,* 264 U. S. 504; *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393; *Adams* v. *Tanner,* 244 U. S. 590.

Those who won our independence believed that the final end of the State was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.[2] They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence

---

[2] Compare Thomas Jefferson: "We have nothing to fear from the demoralizing reasonings of some, if others are left free to demonstrate their errors and especially when the law stands ready to punish the first criminal act produced by the false reasonings; these are safer corrections than the conscience of the judge." Quoted by Charles A. Beard, The Nation, July 7, 1926, vol. 123, p. 8. Also in first Inaugural Address: "If there be any among us who would wish to dissolve this union or change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it."

coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.

Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. It is the function of speech to free men from the bondage of irrational fears. To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced. There must be reasonable ground to believe that the danger apprehended is imminent. There must be reasonable ground to believe that the evil to be prevented is a serious one. Every denunciation of existing law tends in some measure to increase the probability that there will be violation of it.[3] Condonation of a breach enhances the probability. Expressions of approval add to the probability. Propagation of the criminal state of mind by teaching syndicalism increases it. Advocacy of law-breaking heightens it still further. But even advocacy of violation, however reprehensible morally, is not a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on. The wide difference between advocacy and incitement, between preparation and attempt, between assembling and conspiracy, must be borne in mind. In order to support a finding of clear and present danger it must be shown either that immediate serious violence was to be expected or was advocated, or that the past conduct furnished reason to believe that such advocacy was then contemplated.

---

[3] Compare Judge Learned Hand in *Masses Publishing Co.* v. *Patten*, 244 Fed. 535, 540; Judge Amidon in *United States* v. *Fontana*, Bull. Dept. of Justice No. 148, pp. 4–5; Chafee, "Freedom of Speech," pp. 46–56, 174.

Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty. To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression. Such must be the rule if authority is to be reconciled with freedom.[4] Such, in my opinion, is the command of the Constitution. It is therefore always open to Americans to challenge a law abridging free speech and assembly by showing that there was no emergency justifying it.

Moreover, even imminent danger cannot justify resort to prohibition of these functions essential to effective democracy, unless the evil apprehended is relatively serious. Prohibition of free speech and assembly is a measure so stringent that it would be inappropriate as the means for averting a relatively trivial harm to society. A police measure may be unconstitutional merely because the remedy, although effective as means of protection, is unduly harsh or oppressive. Thus, a State might, in the exercise of its police power, make any trespass upon the

---

[4] Compare Z. Chafee, Jr., "Freedom of Speech", pp. 24–39, 207–221, 228, 262–265; H. J. Laski, "Grammar of Politics", pp. 120, 121; Lord Justice Scrutton in *Rex* v. *Secretary of Home Affairs, Ex parte O'Brien*, [1923] 2 K. B. 361, 382: "You really believe in freedom of speech, if you are willing to allow it to men whose opinions seem to you wrong and even dangerous; . . ." Compare Warren, "The New Liberty Under the Fourteenth Amendment," 39 Harvard Law Review, 431, 461.

land of another a crime, regardless of the results or of the intent or purpose of the trespasser. It might, also, punish an attempt, a conspiracy, or an incitement to commit the trespass. But it is hardly conceivable that this Court would hold constitutional a statute which punished as a felony the mere voluntary assembly with a society formed to teach that pedestrians had the moral right to cross unenclosed, unposted, waste lands and to advocate their doing so, even if there was imminent danger that advocacy would lead to a trespass. The fact that speech is likely to result in some violence or in destruction of property is not enough to justify its suppression. There must be the probability of serious injury to the State. Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech and assembly.

The California Syndicalism Act recites in § 4:

" Inasmuch as this act concerns and is necessary to the immediate preservation of the public peace and safety, for the reason that at the present time large numbers of persons are going from place to place in this state advocating, teaching and practicing criminal syndicalism, this act shall take effect upon approval by the Governor."

This legislative declaration satisfies the requirement of the constitution of the State concerning emergency legislation. *In re McDermott,* 180 Cal. 783. But it does not preclude enquiry into the question whether, at the time and under the circumstances, the conditions existed which are essential to validity under the Federal Constitution. As a statute, even if not void on its face, may be challenged because invalid as applied, *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282, the result of such an enquiry may depend upon the specific facts of the particular case. Whenever the fundamental rights of free speech and assembly are alleged to have been in-

vaded, it must remain open to a defendant to present the issue whether there actually did exist at the time a clear danger; whether the danger, if any, was imminent; and whether the evil apprehended was one so substantial as to justify the stringent restriction interposed by the legislature. The legislative declaration, like the fact that the statute was passed and was sustained by the highest court of the State, creates merely a rebuttable presumption that these conditions have been satisfied.

Whether in 1919, when Miss Whitney did the things complained of, there was in California such clear and present danger of serious evil, might have been made the important issue in the case. She might have required that the issue be determined either by the court or the jury. She claimed below that the statute as applied to her violated the Federal Constitution; but she did not claim that it was void because there was no clear and present danger of serious evil, nor did she request that the existence of these conditions of a valid measure thus restricting the rights of free speech and assembly be passed upon by the court or a jury. On the other hand, there was evidence on which the court or jury might have found that such danger existed. I am unable to assent to the suggestion in the opinion of the Court that assembling with a political party, formed to advocate the desirability of a proletarian revolution by mass action at some date necessarily far in the future, is not a right within the protection of the Fourteenth Amendment. In the present case, however, there was other testimony which tended to establish the existence of a conspiracy, on the part of members of the International Workers of the World, to commit present serious crimes; and likewise to show that such a conspiracy would be furthered by the activity of the society of which Miss Whitney was a member. Under these circumstances the judgment of the state court cannot be disturbed.

Our power of review in this case is limited not only to the question whether a right guaranteed by the Federal Constitution was denied, *Murdock* v. *City of Memphis*, 20 Wall. 590; *Haire* v. *Rice*, 204 U. S. 291, 301; but to the particular claims duly made below, and denied. *Seaboard Air Line Ry.* v. *Duvall*, 225 U. S. 477, 485–488. We lack here the power occasionally exercised on review of judgments of lower federal courts to correct in criminal cases vital errors, although the objection was not taken in the trial court. *Wiborg* v. *United States*, 163 U. S. 632, 658-660; *Clyatt* v. *United States*, 197 U. S. 207, 221-222. This is a writ of error to a state court. Because we may not enquire into the errors now alleged, I concur in affirming the judgment of the state court.

MR. JUSTICE HOLMES joins in this opinion.