[Civ. No. 23943.   First Dist., Div. One.   Mar. 26, 1968.]

LOUIS CROSSWHITE, Plaintiff and Appellant, v. THE
MUNICIPAL COURT OF THE EUREKA JUDICIAL
DISTRICT OF HUMBOLDT COUNTY et al., Defend-
ants and Respondents.

Cibula & Cibula, Alvin M. Cibula and Franklin S. Cibula for Plaintiff and Appellant.

Melvin S. Johnsen, City Attorney, in pro. per., and Thomas M. Montgomery, County Counsel, for Defendants and Respondents.

ELKINGTON, J.—Involved in this appeal is the relationship between the First Amendment rights of free speech and free press, and a court's power to punish as contempt the placing of a newspaper advertisement relating to a pending criminal trial by jury.

The City of Eureka by ordinance had imposed a transient occupancy tax on motels and hotels. The tax was locally known as the "Bed Tax," and it was the subject of continuing and widespread discussion in the community. The ordinance was about a year old and was passed by the city council only after a heated controversy.

Two individuals, Omicini and Panni, and the "Omicini" corporation were charged in the municipal court with misdemeanor violations of the ordinance. Many news articles appeared in the local papers discussing the impending trial and

its background. These stories continued up to and including the day set for the trial.

The trial was set for January 12, 1966. A list of 60 persons had been drawn and summoned as the trial jury panel.

The *Humboldt Standard* and *Humboldt Times* were, respectively, evening and morning newspapers published in the City of Eureka. These newspapers had a large circulation in the county and judicial district where the trial was scheduled to be held. Appellant Louis Crosswhite, a complete stranger to the Omicini case, placed an advertisement with the *Humboldt Standard* with instructions that it appear on three separate pages of its January 11 evening edition. He placed the same advertisement with the *Humboldt Times* with instructions that it be printed on three separate pages of its morning edition of January 12. The advertisement carried the following message:

"Bed Tax Case

The Omicini Investment Co., Inc. is on trial this week in a test case of the Eureka City Ordinance Bed Tax.
The United States is the only country in the world that taxes its citizens for the right to Sleep in Bed.
This tax is optional to each city in California. Why does Eureka have the tax when many other cities do not?

Paid For by Citizens and Taxpayers."

It was 4 inches by 2¼ inches in size. The words "Bed Tax Case" were printed in heavy block letters about one-half inch in height.

On January 12, the Omicini trial was reset for May 25, 1966 because of the advertisement. Contempt proceedings were thereafter instituted against appellant Crosswhite in the municipal court.

After a hearing the court rendered its decision, which, in part, read as follows:

"The Court finds that Crosswhite did place the advertisements in the two newspapers and further, because of the reference in the advertisements to 'trial this week,' that he knew of the jury trial to commence on January 12, 1966.

"The basic issue for the Court to determine in this contempt proceeding is whether Crosswhite was wrongfully attempting to influence any trial jurors or was merely express-

ing his opinion concerning the merits of an existing ordinance.

"It appears clear that the primary purpose of the [advertisements] was to influence the persons drawn or summoned to appear as jurors in not just an impending but a very pending case. . . . There were no current hearings scheduled before the City Council or any bodies concerning the merits or any other phase of the transient Tax Ordinance. The only hearing pending was a criminal trial to determine whether any or all of the defendants had violated the ordinance. The advertisements constitute a not too subtle entreaty to potential jurors to consider issues really not before those jurors: . . ."

The court concluded that the placing of the advertisement constituted a " 'clear and present danger' " to the orderly administration of justice. Crosswhite was adjudged guilty of contempt and sentence was imposed. Thereafter Crosswhite filed a petition for a writ of review in the superior court. After a hearing the petition was denied. It is from the order denying the petition for review that this appeal is taken.

■ On review of a contempt judgment it is settled that the sole question before the reviewing court is one of jurisdiction of the trial court to render the judgment under review. (*Oil Workers Intl. Union* v. *Superior Court,* 103 Cal.App.2d 512, 526 [230 P.2d 71].) Ordinarily in such a case a review of the evidence is limited to determining whether there was any substantial evidence before the trial court to sustain its jurisdiction. (*City of Vernon* v. *Superior Court,* 38 Cal.2d 509, 517 [241 P.2d 243].) However, where, as here, the case involves First Amendment constitutional issues, a reviewing court will make its own independent examination of the whole record. (*Zeitlin* v. *Arnebergh,* 59 Cal.2d 901, 909 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707].)

We therefore direct our attention to the question whether or not the evidence before the municipal court was sufficient to give that court jurisdiction to pronounce its judgment of contempt.

■ Crosswhite had an absolute First Amendment right to place the advertisement at issue, unless his act presented a "clear and present danger" to the administration of justice. (See *Schenck* v. *United States,* 249 U.S. 47, 52 [63 L.Ed. 470, 473, 39 S.Ct. 247]; *Bridges* v. *California,* 314 U.S. 252, 261 [86 L.Ed. 192, 202, 62 S.Ct. 190, 159 A.L.R. 1346].) This element was basic to the court's jurisdiction to adjudge his act to constitute contempt.

.The "clear and present danger" test has never been precisely defined, probably because as stated in *Bridges* v. *California, supra,* at page 260 [86 L.Ed. at p. 201], "free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." Mr. Justice Brandeis said in his concurring opinion in *Whitney* v. *California,* 274 U.S. 357 [71 L.Ed. 1095, 47 S. Ct. 641] : "This Court has not yet fixed the standard by which to determine when a danger shall be deemed clear; how remote the danger may be and yet be deemed present." The evil he said must be "substantial" (p. 374 [71 L.Ed. at p. 1105]) and "serious" (p. 376 [71 L.Ed. at p. 1106]). ██ What finally emerges from the many decisions on the subject, states *Bridges* v. *California, supra,* 314 U.S. 252, 263 [86 L.Ed. 192, 202], "is a working principle that *the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished.*" (Italics added.) *Bridges* further held at page 262 [86 L.Ed. at p. 202] that "the likelihood, however great, that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press." In each case the court must ask " 'whether the gravity of the "evil," discounted by its improbability, justifies such invasion of freedom of speech as is necessary to avoid the danger.' " (*Dennis* v. *United States,* 341 U.S. 494, 510 [95 L. Ed. 1137, 1153, 71 S.Ct. 857] ; approving language of Justice Learned Hand in *United States* v. *Dennis,* 183 F.2d 201, 212.)

Recognizing that court "trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper," the court in *Bridges* v. *California, supra,* 314 U. S. 252, 271 [86 L.Ed. 192, 207], said: "But we cannot start with the assumption that publications of the kind here involved actually do threaten to change the nature of legal trials, and that to preserve judicial impartiality, it is necessary for judges to have a contempt power by which they can close all channels of public expression to all matters which touch upon pending cases. We must therefore turn to the particular utterances here in question and the circumstances of their publication to determine to what extent the substantive evil of unfair administration of justice was a likely consequence, and whether the degree of likelihood was sufficient to justify summary punishment."

██ We have closely considered the undisputed facts before us. Applying the standards prescribed by the United States Supreme Court we cannot say of Crosswhite's act that

its substantive evil was extremely serious or that the degree of the evil's imminence was extremely high. The advertisement therefore did not pose a "clear and present danger" to the administration of justice. The judgment of the superior court must accordingly be reversed.

The Bed Tax had been vigorously debated public issue in the press and elsewhere for several months. On the morning set for the Omicini trial an article in the newspaper containing the advertisement recalled that the ordinance had been passed over the heated objections of local citizens. The item related that the Omicini defendants were "charged with failure to register with the City Finance Director in relation to the tax and with failure, on two counts, to remit and report the collected tax." It pointed out that "Omicini has consistently maintained that the tax is unconstitutional."

Crosswhite's advertisement did not more than reiterate a portion of the Bed Tax discussions to which the citizens of Eureka and prospective Omicini trial jurors had been exposed for many months. It did not mention the individual defendants and it did not suggest action one way or the other by the court or jury. Indeed, the city prosecutor, while arguing that the advertisements tended to influence the outcome of the trial, was unable to express an opinion as to which side would probably be favored.[1]

"Courts must have power to protect the interests of prisoners and litigants before them from unseemly efforts to pervert judicial action. *In the borderline instances where it is difficult to say upon which side the alleged offense falls, we think the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases.*" (Italics added.) (*Pennekamp* v. *Florida,* 328 U.S. 331, 347 [90 L.Ed. 1295, 1303, 66 S.Ct. 1029].)

The effect of the advertisement seems highly speculative. We find it difficult to believe that any jury, examined on *voir dire,* properly instructed as to their duty and sworn to try the case on the evidence adduced at the trial, would be influenced thereby.

We are mindful of a court's high duty to keep out-of-court influences from directing the course of a jury's verdict. We give merited respect to the rule that "the atmosphere essential to the preservation of a fair trial—the most fundamen-

---

[1]On the morning the Omicini case was called for trial, each side expressed a belief that it might be prejudiced by Crosswhite's advertisement.

434

tal of all freedoms—must be maintained at all costs." (*Estes* v. *Texas*, 381 U.S. 532, 540 [14 L.Ed.2d 543, 548, 85 S.Ct. 1628].) But as stated in *Pennekamp* v. *Florida, supra,* 328 U. S. 331, 347 [90 L.Ed. 1295, 1303], "Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice."

It is argued that the timing of Crosswhite's advertisement shows an intent to affect the outcome of the Omicini trial. It may be, as found by the court, that the ads were intended, at least in part, to influence the outcome of the case. But whether or not such intent existed, the issue as to whether the advertisement constituted a "clear and present danger" must still be resolved before the contempt judgment may stand.

The order of the superior court denying appellant Crosswhite's petition for a writ of review is reversed. The cause is remanded for proceedings consistent with this opinion.

Molinari, P. J., and Sims, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied May 22, 1968.