WONG, J.
I dissent.
Appellants, students of San Fernando Valley State College, were arrested on January 9, 1969, while attending an assembly in the Open Forum, an area set aside by the college for free speech and assemblies. The Open Forum was located in an area which permits such activities without interruption to the academic work of the college.
*Supp. 11 Appellants were convicted of violation of Penal Code section 409, which reads: “Every person remaining present at the place of any riot, rout, or unlawful assembly, after the same has been lawfully warned to disperse . . . is guilty of a misdemeanor.” In the present case, in order to sustain the convictions, the evidence must show that at the time the warning to disperse was given, there in fact existed an unlawful assembly. It is not enough that an administrative officer declared that the assembly was unlawful, or that he reasonably believed that the assembly would become or was unlawful. The lawfulness or unlawfulness of the assembly is a question of fact for the trial judge or jury.
On appeal in cases such as the present one where First Amendment rights are concerned, the duty of the appellate court is to make “an independent examination of the whole record.”[1]
In Cox v. Louisiana (1965) 379 U.S. 536, 545 [13 L.Ed.2d 471, 478, 85 S.Ct. 453], the United States Supreme Court stated: “Because a claim of constitutionally protected right is involved, it ‘remains our duty in a case such as this to make an independent examination of the whole record.’ Edwards v. South Carolina, 372 U.S. 229, 235, 9 L.Ed.2d 697, 701, 83 S.Ct. 680. . . .”[2]
Similarly, our California Supreme Court has stated: “In addition, the reviewing court in free speech cases must make an independent examination of the whole record. (Zeitlin v. Arneberg, 59 Cal.2d 901, 909 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707].)” (Los Angeles Teachers Union v. Los Angeles City Board of Education (1969) 71 Cal.2d 551, 557 [78 Cal.Rptr. 723, 455 P.2d 827].)[3]
In Crosswhite v. Municipal Court (1968) 260 Cal.App.2d 428, 431 [67 Cal.Rptr. 216], the Court of Appeal stated: “On review of a contempt judgment it is settled that the sole question before the reviewing court is one of jurisdiction of the trial court to render the judgment under review [citation]. Ordinarily in such a case a review of the evidence is limited to *Supp. 12 determining whether there was any substantial evidence before the trial court to sustain its jurisdiction [citation]. However, where, as here, the case involves First Amendment constitutional issues, a reviewing court will make its own independent examination of the whole record. (Zeitlin v. Arnebergh, 59 Cal.2d 901, 909 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707].)”i **[4]
In People v. Gould (1966) Cr. A. 6731, this court followed the mandate of Cox v. Louisiana, supra, and made an independent examination of the whole record in a picketing case. I believe we should do so in this case also.
The right of peaceable assembly is guaranteed by the First Amendment of the United States Constitution and by article I, section 10 of the California Constitution.
The United States Supreme Court in De Jonge v. Oregon (1937) 299 U.S. 353 [81 L.Ed. 278, 57 S.Ct. 255] stated that the rights of free speech and free assembly were cognate and equally fundamental; hence: “[Peaceable assembly for lawful discussion cannot be made a crime. The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score.” (299 U.S. 353, 365 [81 L.Ed. 278, 284].)
The constitutional mandate to protect free speech and free assembly is not left at the campus gate. “[C]olleges, like all other institutions, are subject to the Constitution.” Hammond v. South Carolina State College (D.S.C. 1967) 272 F.Supp. 947, 949 (cited with approval in Tinker v. Des Moines Independent Community School Dist. (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733]). Restraints which are placed upon campus activities that are within the ambit of First Amendment freedoms must comport with the dictates of the Constitution. (Hammond v. South Carolina State College, supra.)
In First Amendment situations, there is a right to engage in the protected activity unless it presents a clear and present danger to public safety. (Crosswhite v. Municipal Court (1968) 260 Cal.App.2d 428, 431 [67 Cal.Rptr. 216].) “What finally emerges from the ‘clear and present danger’ cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished.” (Bridges v. California (1941) 314 U.S. 252, 263 [86 L.Ed. 192, 203, 62 S.Ct. 190, 159 A.L.R. 1346].) “[Whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, *Supp. 13 must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation. It is therefore in our tradition to allow the widest room for discussion, the narrowest range for its restriction, particularly when this right is exercised in conjunction with peaceable assembly. . . . [The First Amendment rights] though not identical, are inseparable.” (Thomas v. Collins (1945) 323 U.S. 516, 530 [89 L.Ed. 430, 440, 65 S.Ct. 315].)
In the present case, there obviously was no riot, nor rout, and the only issue is whether there was in fact an “unlawful assembly.” Under Penal Code section 407, an “unlawful assembly” can occur whenever two or more persons assemble together,
(1) to do an unlawful act, and separate without doing or advancing toward it (See Coverstone v. Davies (1952) 38 Cal.2d 315, 320 [239 P.2d 876], where a group assembled to view a “hot-rod” race; and In re Bacon (1966) 240 Cal.App.2d 34 [49 Cal.Rptr. 322], where a group was found guilty of trespassing in violation of Penal Code, section 602, subdivision (o); or
(2) to do a lawful act in a violent, boisterous, or tumultuous manner (See People v. Gould (Barkley, appellant) (1969) Crim. A. Nos. 7831, 7832, where a group of anti-war demonstrators were peacefully picketing at the Century Plaza Hotel during a visit by the President of the United States. We reversed the conviction on the ground of insufficient evidence to support a finding of “violent, boisterous and tumultuous” conduct.)
In the majority opinion, the issue is framed as follows: “There was no-showing that anything was said or would be said at the forum on the day of the arrests which would constitute a clear and present danger, and hence the inference that an unlawful assembly existed cannot be justified on such basis. . . . Thus, in the present case we must determine whether the trial judge was justified in holding that the assembly had convened that morning, not just to talk and not just to provoke acts but to act, to act in violation of the law.” {Ante, pp. Supp. 5, 6.)
Received into evidence were five reels of motion picture films in color (viewing time: 1 hour, 39 minutes),[5] four of which were taken by police photographers and one by cameramen from KABC-TV, Channel 7. We have viewed the films. No one claims that the films do not accurately *Supp. 14 portray the events of January 7, 8,- and 9 at San Fernando Valley State College. Three reels which were taken on January 9 minutely depict the gathering of the students in the Open Forum, the giving of speeches, the giving of the order to disperse, and the arrests. The students were cooperative and submitted to arrest peacefully and without incident. Some of the women students were crying as they were being arrested, or waiting to be arrested. There were many tear-streaked faces and determined looks, but no resistance. After viewing the films, one can only conclude that the students were submitting to arrest because they believed that they had a right to assemble peacefully in the Open Forum area.
Two reels recorded the events of January 7 and 8. The films show an assembly of students in the Open Forum, speeches, and a march towards the administration building which to me appear to be orderly and peaceful. Upon the arrival of the marchers, two or three police officers opened the door, and some of the marchers entered the building. The police officers then arrested some of the marchers in the building and others outside of the building after a foot-race. At no time did it appear that the police did not have complete control of the situation. The confrontation between the students and the police was more symbolic than violent. At least the pictures did not portray any acts on the part of the students which would justify such a drastic measure as prohibiting future peaceful assemblies.
In the majority opinion, it is recognized that what was said and done by the students assembled in the Open Forum on January 9 would not support an inference that the assemblage was unlawful, nor that “any-speeches were about to be made which by themselves would constitute a clear and present danger.” {Ante, p. Supp. 8.) If nothing that was said and done by the students was unlawful, what made the assembly unlawful?
The majority opinion seeks to justify the administrative decision of Dr. Oviatt and Captain Lembke to disperse an assembly which everyone agrees was peaceful and to order the arrest of those who refused to obey upon the theory that “history was about to repeat itself.”[6] {Ante, p. Supp. 8.)
I disagree with this theory for three reasons:
(1) I believe that student assemblies, even on the same campus, can differ from day to day and that each student assembly is entitled to an individual determination of lawfulness.
*Supp. 15 (2) The record in this very case demonstrates that the assembly of January 9 differed greatly from the events of January 7 and 8.
(3) This theory completely ignores the generally accepted rule that “any attempt to restrict freedom of assembly'must be justified ... by clear and present danger, .... only the gravest abuses, endangering paramount interest, give occasion for permissible limitation of the right of free assembly.” (16 C.J.S. Constitutional Law, § 214, p. 1167.)
In analyzing the assemblies of January 7 and 8, my colleagues have divided what occurred into three stages as follows: “For two days a definite pattern had been developing: First, students met in the forum. Second, they were there harangued by other students, teachers, and outsiders until they were worked up to the point of action. Third, they would march to the administration building and cause violence.” {Ante, p. Supp. 6.)
In contrast with these assemblies, the January 9 assembly had not even passed the first stage when the students were arrested. No unlawful acts had been committed by anyone at the assembly, and as my colleagues state: “What had occurred thus far on January 9, taken alone, would not support an inference that the assemblage was unlawful. Even when you add what had previously occurred, it would not justify an inference that any speeches were about to be made which by themselves would constitute a clear and present danger. The arrests must be justified, if at all, upon the basis of whether, from all of the circumstances, reasonable men could draw an inference that history was about to repeat itself and that the ultimate objective of the assemblage was not merely to provoke violence, but to actually engage in violence.” {Ante, p. Supp. 8.)
The inference “that history was about to repeat itself and that the ultimate objective of the assemblage was not merely to provoke violence but to actually engage in violence” was not based upon any facts, but upon speculation, surmise and conjecture.
I do not think that a college administrator, a police officer, or even a legislative body can ignore the “clear and present danger” test and prevent people (including students) from peacefully assembling, at a place where they have a right to be, merely because the person or persons who are charged with the responsibility for making the administrative or legislative decision suspects or fears that the assembly may at some future time become unlawful.
In Sellers v. Johnson (8th Cir. 1947) 163 F.2d 877, 881, the court stated: “Certainly the fundamental rights to assemble, to speak, and to worship cannot be abridged merely because persons threaten to stage a riot or *Supp. 16 because peace officers believe or are afraid that breaches of the peace will occur if the rights are exercised.”
In Whitney v. California[7] (1927) 274 U.S. 357, 377 [71 L.Ed. 1095, 1106, 47 S.Ct. 632], Mr. Justice Brandéis, in his concurring opinion—in which Mr. Justice Holmes joined—said: “Moreover, even imminent danger cannot justify resort to prohibition of these functions essential to effective democracy, unless the evil apprehended is relatively serious. Prohibition of free speech and asembly is a measure so stringent that it would be inappropriate as the means for averting a relatively trivial harm to society.”
Mr. Justice Brandéis also said (274 U.S. 357 at p. 378 [71 L.Ed. 1095 at p. 1107]): “The fact that speech is likely to result in some violence or in destruction of property is not enough to justify its suppression. There must be the probability of serious injury to the state. Among freemen, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech and assembly.”
When viewed in proper perspective, the refusal of the students to leave the peaceful assembly7 [8] on January 9 was nothing more than a “sit-in” demonstration[9] in the Open Forum and was about as innocuous as the wearing of black arm-bands by the students in Tinker v. Des Moines Independent Community School Dist. (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733]. What possible substantive harm could flow from such innocuous activity? If at some future time the peaceful sit-in should present a clear and present dager of violence or unlawfulness, the administrative officials could terminate the assembly.
In the present case, the college administration and the police department were fully able to handle any foreseeable emergency. The motion picture films indicate that there were more than enough police officers present to handle the situation on January 7, 8, and 9. The ability of the police to control the crowd is a factor in determining whether a clear and present *Supp. 17 danger exists. (Cox v. Louisiana (1965) 379 U.S. 536, 549 [13 L.Ed.2d 471, 481, 85 S.Ct. 453].)
In dealing with First Amendment freedoms, college administrators, law enforcement officials, and judges must be able to differentiate between peaceful demonstrations and violent activities, between peaceful assemblies and unlawful assemblies, and must be ready, willing, and able to apply the clear and present danger test and to strike an impartial balance between conflicting interests.
“The rights of students and teachers to express their views on school policies and governmental actions relating to schools, and the power of school authorities to regulate political activities of students and faculty, are of peculiar concern to our state and nation today. Education is in a state of ferment, if not turmoil. When controversies arising from or contributing to this turbulence are brought before the courts, it is imperative that the courts carefully differentiate in treatment those who are violent and heedless of the right of others as they assert their cause and those whose concerns are no less burning but who seek to express themselves through peaceful, orderly means. In order to discourage persons from engaging in the former type of activity, the courts must take pains to assure that the channels of peaceful communication remain open and that peaceful activity is fully protected.” (Los Angeles Teachers Union v. Los Angeles City Board of Education (1969) 71 Cal.2d 551, 565 [78 Cal.Rptr. 723, 455 P.2d 827].)
The above words of the Supreme Court (in a unanimous opinion) are fully applicable to appellants and the other students who were arrested in the Open Forum while attending a peaceable assembly on January 9, 1969. The fact that other students on November 4, 1968, forcibly detained as hostages a number of faculty members, the fact that the president’s office was set afire on December 8, 1968, the fact that there were bomb threats in December, and the fact that there were fights in the Open Forum on December 20, 1968, in no way changed the peaceable nature of the assembly of January 9, 1969.
Even the events of January 9 did not justify the banning of the peaceful assembly. If it was unlawful for certain individuals to wear helmets, carry walkie-talkies, remove earrings, or carry empty pop bottles, the guilty parties should have been arrested. If it was unlawful for an unidentified individual to remove a rock, wrap it, and place it in a trash can, he too should have been arrested. More than enough police officers were present to maintain order. There was no justification for impairing the right of peaceable assembly.
*Supp. 18 The five reels of motion picture films taken by police photographers and television cameramen tell the whole story. The films of the events of January 7 and 8 clearly show that the police had the situation well under control at all times and that the conduct of the students did not justify the banning of future peaceable assemblies. The films of January 9 clearly show that the assembly was peaceful and orderly, and that there was an absence of clear and present danger of any violence or other unlawful acts.
I would reverse the decision of the trial court.

While the majority opinion speaks in terms of “an independent examination of the entire record,” it also states: “In view of the pattern of the last two months and particularly the last two days (i.e., first going to the forum; second, speeches; third, violence), we cannot say as a matter of law that the trial judge erroneously drew that inference. We have no right to reweigh the evidence. Nor can we say as a matter of law that Captain Lembke erroneously drew the same inference. Thus his warning was lawful.” {Ante, p. Supp. 8.)

In the Cox case, 1,500 to 2,000 students assembled at the site of the old state capítol building, two and one-half blocks from the courthouse, marched to the courthouse, and assembled across the street from the courthouse. In the Edwards case, the petitioners conducted a demonstration on the South Carolina State House grounds.

The Los Angeles Teachers Union case concerned First Amendment rights of teachers; Zeitlin was an obscenity case.

Crosswhite involved free speech and free press as opposed to the court’s power to punish as contempt the placing of a newspaper advertisement relating to a pending criminal case to be tried by jury.

Three reels including the KABC-TV news films (defendant’s A in Uptgraft), P 5653 reel 2 (by reference to defendant’s D in People v. Hairston (Crim A. No. 8952) post, p. Supp. 19 [87 Cal.Rptr. 470]), and defendant’s C in Hairston cover the January 9 events and run 46 minutes. The remaining 53 minutes of film, P 5653— reel 1 (defendant’s F in Hairston) and defendant’s H in Hairston cover the events of January 7 and 8.

As of 2 a.m. on the morning of January 9, even Dr. Oviatt did not believe that “history was about to repeat itself" and that all future assemblies should be banned. He himself had accepted an invitation the previous afternoon tendered by the President of the Associated Students to address a meeting at 12 o’clock on January 9 in the Open Forum. (People v. Barrish, reporter's transcript pp. 178-179.)

While the holding in Whitney has been discredited (Brandenburg v. Ohio (1969) 395 U.S. 444, 449 [23 L.Ed.2d 430, 434, 89 S.Ct. 1827]), the language quoted here remains viable.

“It is undisputed that on the morning of the arrests, the assembled students were not violent and that all of them were waiting peacefully in the ‘forum’ area (set aside for speeches) at the time of their arrests.” (Ante, p. Supp. 4.)

“Yes, there were speakers all morning long that were urging the group, urging students to take seats in the Forum Area—chairs had been placed there—and to lock arms. The advice to the girls was to remove earrings. They told the individuals not to resist when they were arrested. They were given phone numbers of bail bondsmen to be called. . . .” (Uptgraft Tr. p. 44, 11, or, 12-18; testimony of Officer William T. Whisenhunt, L.A.P.D.)