**John Clifford TESMER, Charles Carter, and Alois Schnell, on behalf of themselves and all similarly situated individuals, and Arthur M. Fitzgerald and Michael D. Vogler, Plaintiffs,**

**v.**

**Jennifer GRANHOLM, Attorney General of the State of Michigan, in her official capacity; and Judge John F. Kowalski, Judge William A. Crane and Judge Lynda Heathscott, in their official capacity, individually and as representatives of a class of similarly situated circuit court judges, Defendants.**

No. 00–10082.

United States District Court,
E.D. Michigan,
Northern Division.

March 31, 2000.

Kary L. Moss, Mark Granzotto, Detroit, MI, Jeanice Dager–Margosian, Ann Arbor, MI, for Plaintiffs.

Thomas R. Wheeker, Michigan Department of Attorney General, Lansing, MI, for Defendants.

**OPINION AND ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS, (2) DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; AND (3) GRANTING PLAINTIFFS' REQUEST FOR DECLARATORY JUDGMENT**

ROBERTS, District Judge.

## I. *Introduction*

This 42 U.S.C. § 1983 matter is before the Court on Defendants' Motion to Dismiss and Plaintiffs' Motion for Preliminary Injunction. The Complaint, filed March 2, 2000, further requests that this Court issue an Order declaring that P.A.1999 No. 200, violates the Plaintiffs' rights to due process and equal protection as guaranteed by the United States Constitution, and further declaring that the judicial officer Defendants acted under color of law, in violation of § 1983, in denying indigents the appointment of counsel to prepare original appeals from their plea-based convictions.

For the reasons stated below, the Court grants in part and denies in part Defendants' Motion to Dismiss. Further, while the Court finds that the judicial officer Defendants acted under color of law in denying indigents' requests for the appointment of counsel, § 1983 does not permit injunctive relief against a judicial officer for action taken in that officer's judicial capacity, unless such officer has violated a declaratory decree or declaratory relief was unavailable. Hence, this Court denies Plaintiffs' Motion For Preliminary Injunction.

However, pursuant to the Plaintiffs' request for relief in their complaint, the Court finds this case to be an appropriate one for declaratory relief under Fed. R.Civ.P. 57 and 28 U.S.C. § 2201. Accord-

ingly, the Court declares the practices of the judicial officer Defendants and other similarly situated state circuit court judges, of denying indigents who have pleaded guilty or nolo contendere the right to appointed appellate counsel in preparing applications for leave to appeal, to be in violation of the indigents' equal protection and due process rights guaranteed under the United States Constitution.

Additionally, the Court declares that 1999 P.A. 200, scheduled to take effect on April 1, 2000, is unconstitutional in that it denies equal protection and due process to indigent individuals who have pleaded guilty or nolo contendere.

## II. *Background*

In November 1994, Michigan's constitution was amended to eliminate appeals of right for criminal defendants who pled guilty or nolo contendere. Specifically, MI. Const.1963, Art. 1, § 20 was amended to provide that criminal defendants may:

appeal as a matter of right, except as provided by law an appeal by an accused who pleads guilty or nolo contendere shall be by leave of the court; and as provided by law, when the trial court so orders, to have such reasonable assistance as may be necessary to perfect and prosecute an appeal.

Plaintiffs allege that after the amendment to § 20, a number of Michigan circuit court judges began to routinely deny the requests of indigent Defendants for the appointment of appellate counsel to prepare applications for leave to appeal their plea-based convictions and sentences. This practice is especially prevalent in the 10th Circuit Court in Saginaw, according to Plaintiffs (Cmpt. at ¶ 18).

Three Plaintiffs allege that, consistent with this practice, the named judicial officer Defendants denied them appellate counsel. Plaintiff John Clifford Tesmer pled guilty to a charge of home invasion in 1999. After Defendant Judge John F. Kowalski of the 26th Circuit Court of Alcona sentenced Plaintiff, the judge denied Tesmer's request for appointed appellate

counsel (Cmpt. at ¶¶ 19–22). After his 1999 guilty plea and sentencing for the charge of attempted murder, Plaintiff Charles' Carter was denied appointed appellate counsel by Defendant Judge William A. Crane of the 10th Circuit Court (Cmpt. at ¶¶ 23–26). Likewise, Plaintiff Alois Schnell was denied appellate counsel by Defendant Judge Lynda L. Heathscot of the 10th Circuit after Schnell's pled guilty to operating a vehicle under the influence of liquor (Cmpt. at ¶¶ 27–30). (Hereinafter, Judges Kowalski, Crane and Heathscott will be referred to as "the Judges," and Mr. Tesmer, Mr. Carter and Mr. Schnell will collectively be referred to as "the Indigents.")

The practice of denying appellate counsel to indigent Defendants who plead guilty or nolo contendere has now been codified. P.A.1999, No. 200 provides:

Sec. 3a. (1) Except as provided in subsections (2) and (3), a defendant who pleads guilty, guilty but mentally ill, or nolo contendere shall not have appellate counsel appointed for review of the defendant's conviction or sentence.

(2) The trial court shall appoint appellate counsel for an indigent defendant who pleads guilty, guilty but mentally ill, or nolo contendere if any of the following apply:

(a) The prosecuting attorney seeks leave to appeal.

(b) The defendant's sentence exceeds the upper limit of the minimum sentence range of the applicable sentencing guidelines.

(c) The court of appeals or the supreme court grants the defendant's application for leave to appeal.

(d) The defendant seeks leave to appeal a conditional plea under Michigan Court Rule 6.301(C)(2) or its successor rule.

(3) The trial court may appoint appellate counsel for an indigent defendant who pleads guilty, guilty but mentally ill,

or nolo contendere if all of the following apply:

(a) The defendant seeks leave to appeal a sentence based upon an alleged improper scoring of an offense variable or a prior record variable.

(b) The defendant objected to the scoring or otherwise preserved the matter for appeal.

(c) The sentence imposed by the court constitutes an upward departure from the upper limit of the minimum sentence range that the defendant alleges should have been scored.

(4) While establishing that a plea of guilty, guilty but mentally ill, or nolo contendere was made understandingly and voluntarily under Michigan Court Rule 6.302 or its successor rule, and before accepting the plea, the court shall advise the defendant that, except as otherwise provided in this section, if the plea is accepted by the court, the defendant waives the right to have an attorney appointed at public expense to assist in filing an application for leave to appeal or to assist with other post conviction remedies, and shall determine whether the defendant understands the waiver. Upon sentencing, the court shall furnish the defendant with a form developed by the state court administrative office that is nontechnical and easily understood and that the defendant may complete and file as an application for leave to appeal.

(Hereinafter, the "Act").

Plaintiffs allege that, although the appointment of appellate counsel is authorized under the circumstances set forth in subsections 2 and 3, the Act will prohibit circuit court judges from appointing counsel to indigent defendants in most plea-based applications for leave to appeal (Cmpt. at ¶ 32).[1]

The other two Plaintiffs are attorneys. Arthur M. Fitzgerald and Michael D. Vogler allege that they earn a portion of their incomes taking assigned appeals for trial and plea based convictions. Fitzgerald is on a list of qualified attorneys to take such assignments in the 10th Circuit while Vogler is on the 26th Circuit Court's list. Plaintiffs allege that the present practice of denying appellate counsel after plea-based convictions has adversely affected the attorneys' incomes and the Act will do the same (Cmpt at ¶¶ 33–36). "Mr. Fitzgerald and Mr. Vogler also assert, under the doctrine of *jus tertii*, the constitutional rights of the indigent criminal defendants who will plead guilty or nolo contendere after April 1, 2000 and who will request, but be denied, the appointment of appellate counsel, based on the operation of P.A.1999, No. 200." (Cmpt. at ¶ 37). (Hereinafter, Mr. Fitzgerald and Mr. Vogler will be referred to as "the Attorneys.")

In addition to the Judges, Plaintiffs also name Michigan Attorney General Jennifer Granholm, in her official capacity, as a Defendant (Cmpt. at ¶ 11).

Plaintiffs' Complaint is filed pursuant to § 1983. They allege that the practice of the Judges violates Plaintiffs' due process and equal protection rights and that the Act will do the same (Cmpt. at ¶¶ 38–45). They assert their claims on behalf of a putative Plaintiff class consisting of all indigent Defendants who have pled or will plead guilty or nolo contendere in a Michigan court and who have or will request the appointment of appellate counsel (Cmpt. at 46). Plaintiffs' claims are asserted against the named Defendants as well as against a putative Defendant class consisting of all Michigan circuit court judges and their successors (Cmpt. at ¶ 48).

### III. *Analysis*

Plaintiffs' Motion for Preliminary Injunction focuses on the alleged illegality of the offending practice and the Act, while Defendants' Motion to Dismiss primarily

---

**1.** Note that the practice and Act alleged to be unconstitutional involve the denial of counsel for the preparation of applications for leave to appeal. When leave to appeal is granted, the Act explicitly requires that appointed counsel be provided to indigent defendants.

challenges Plaintiffs' standing to bring this action and this Court's jurisdiction. Since standing and jurisdiction are threshold matters, this Opinion begins with those issues and ends with the merits of Plaintiffs' constitutional claims.

## A. *The Standing of the Attorneys to Challenge the Act*

■ "Article III, § 2, of the Constitution confines federal courts to the decision of 'Cases' or 'Controversies.' Standing to sue or defend is an aspect of the case or controversy requirement." *Arizonans for Official English v. Arizona,* 520 U.S. 43, 64, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).

■ Defendants primarily assert that the Attorneys have no direct stake in the controversy at issue here. Notwithstanding the Attorneys alleged loss of income, if criminal defendants are entitled to appellate counsel to prepare their applications for leave to appeal their plea based conviction, that right belongs to the criminal defendants only, according to Defendants.

The Court believes, however, that the Attorneys have standing pursuant to the doctrine of *jus tertii.* That doctrine is explained in *Powers v. Ohio,* 499 U.S. 400, 410–411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties. This fundamental restriction on our authority admits of certain, limited exceptions.[2] We have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

(Citations and quotation marks omitted).

In *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the Supreme Court applied the *jus tertii* doctrine to hold that the plaintiff doctors had standing to challenge a statute that prohibited Medicaid funding for abortions that were not medically indicated. In the lead opinion, the Court easily determined that the doctors suffered concrete injury by operation of the challenged statute since the doctors had been refused payment for their abortion services and expected future refusals to follow. "If the physicians prevail in their suit to remove this limitation, they will benefit, for they will then receive payment for the abortions." *Id.* at 113, 96 S.Ct. 2868.

Next, the *Singleton* Court determined that the rights of women who desired Medicaid-funded abortions was inextricably bound up with the activities of the doctors.

A woman cannot safely secure an abortion without the aid of a physician, and an impecunious woman cannot easily secure an abortion without the physician's being paid by the State. The woman's

---

**2.** It should be noted that one of the cases Defendants cite, *Portman v. County of Santa Clara,* 995 F.2d 898 (9th Cir.1993), alluded to the exceptions of the direct injury requirement. The court stated, "Although the general rule is that a litigant may assert only his or her own rights, the court has recognized an exception to the prohibition against third party standing where certain criteria are met." *Portman* at 902. The *Portman* plaintiff was a terminated public defender who asserted the Sixth Amendment rights of his clients in his attempt to establish standing. The court did not address whether the criteria for third party standing were met in that case because the clients' rights were not ripe. However, the court also stated, "[W]e must emphasize that we express no view as to whether a public defender would have standing to assert the rights of his clients if the clients' claims were ripe." *Id.* at 904.

Thus, Defendants were inaccurate when they alleged that "the Ninth Circuit rejected Portman's claim that he had no standing to assert the Sixth Amendment rights of his clients." (Dfts' Mot. to Dis. at 5). The *Portman* decision was based on ripeness, not standing.

exercise of her right to an abortion, whatever its dimension, is therefore necessarily at stake here. Moreover, the constitutionally protected abortion decision is one in which the physician is intimately involved. *See Roe v. Wade,* 410 U.S. at 153–156, 93 S.Ct. at 726–728. Aside from the woman herself, therefore, the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, that decision.

*Id.* at 117, 96 S.Ct. 2868.

Finally, and with respect to the third *jud tertii* criteria which must be satisfied, the Court found that women faced obstacles in asserting their own rights, including a chilling effect on assertion of their rights in order to protect their privacy. The women also faced imminent mootness to their claims. While acknowledging that such obstacles were not insurmountable, the court held: "But if the assertion of the right is to be 'representative' to such an extent anyway, there seems little loss in terms of effective advocacy from allowing its assertion by a physician." *Id.* at 117–118, 96 S.Ct. 2868.

The Supreme Court has also held that lawyers have *jus tertii* standing to assert the constitutional rights of their clients. In *Caplin & Drysdale, Chartered v. U.S.,* 491 U.S. 617, 109 S.Ct. 2667, 105 L.Ed.2d 528 (1989), the petitioner attorney's client had all of his assets forfeited because they were found to have been derived from drug-law violations. As a result, the client was unable to pay the petitioner attorney. The Court held that the petitioner had standing to argue that the failure to except attorney fees from the forfeiture statute infringed upon his client's Sixth Circuit rights. It reasoned that the petitioner had a financial stake in the outcome of the case, that the attorney-client relationship is "one of special consequence" and that the statute might have materially impaired the client's ability to exercise his constitutional rights. *Caplin* at 624, n. 3, 109 S.Ct. 2667.

Likewise, in *U.S. Dept. of Labor v. Triplett,* 494 U.S. 715, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990), an attorney was found to have standing to advance the due process rights of his clients to have legal representation. The statute being challenged in that case was the Black Lung Benefits Act of 1972, which prohibited attorneys from receiving fees for representing claimants without approval of the Department of Labor. Before finding that the attorney had standing, the Court recognized that a litigant ordinarily must assert his or her own legal rights:

> When, however, enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement), third-party standing has been held to exist. *See Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 954–958, 104 S.Ct. 2839, 2845–2848, 81 L.Ed.2d 786 (1984) (professional fundraiser given thirdparty standing to challenge statute limiting its commission to 25% as violation of clients' First Amendment right to hire him for a higher fee). A restriction upon the fees a lawyer may charge that deprives the lawyer's prospective client of a due process right to obtain legal representation falls squarely within this principle.

*Triplett* at 720, 110 S.Ct. 1428.

Applying this Supreme Court precedent to the facts of this case, the Court finds that the Attorneys' interest in this matter is similar to that of the doctors in *Singleton.* Like the doctors in *Singleton* and the attorney in *Caplin,* the Attorneys assert that they have lost income as a result of the challenged practice and stand to lose more. And, contrary to Defendants' contention, the Attorneys need not prove they have a "legally cognizable injury" in order to have standing, if that term is meant to suggest that a plaintiff must always have a

cause of action solely on the basis of his or her own rights. In *Powers, supra*, the Supreme Court defined the necessary injury as "an injury in fact," meaning that the litigant must have a "sufficiently concrete interest in the outcome of the issue in dispute." *Powers* at 410–411, 111 S.Ct. 1364, (citations and quotation marks omitted).

Thus, in *Craig v. Boren*, 429 U.S. 190, 194, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), the plaintiff bar owner had standing to assert the constitutional rights of her male customers under the age of 21. She did not allege a cause of action for any violation of her own rights. She alleged that, as a vendor, she was required to carry out the commands of the statute she challenged. Secondly, her failure to obey the statute could lead to sanctions and the loss of her license. The Court held that the plaintiff had standing and stated, "This Court repeatedly has recognized that such injuries establish the threshold requirements of a 'case or controversy' mandated by Art. III. *See, e.g., Singleton v. Wulff, supra*, at 113, 96 S.Ct. at 2873 (doctors who receive payments for their abortion services are 'classically adverse' to government as payer). . . ." *Craig* at 194, 97 S.Ct. 451.

It is significant that the *Craig* court cited the doctors' receipt of payment from the government as establishing the injury requirement of *jus tertii* standing in *Singleton*. Further, neither of the plaintiffs in *Caplin* or *Triplett* were found to have a "legally cognizable injury." Their injuries were their inability to collect the fees they desired. Notably, the *Triplett* court signaled that the loss of fees does not need to be attributable to an existing client. It stated that "[a] restriction upon the fees a lawyer may charge that deprives the lawyer's *prospective* client of a due process right to obtain legal representation falls with [the *jus tertii* ] principle." *Triplett* at 720, 110 S.Ct. 1428, (emphasis added).

Here, the Attorneys, who are listed as qualified to receive appointments from Michigan courts, receive payment from the State for their services. They have a significant concrete interest in the determination of indigent defendants' entitlement to the appointment of counsel for filing leave to appeal plea-based convictions.

Additionally, the Court finds that the Attorneys meet the second requirement for asserting *jus tertii* standing. The Attorneys have a close relationship to indigent defendants who are denied appellate counsel; and, the Attorneys are the appellate counsel whose services are being denied. Furthermore, just as a woman cannot safely secure an abortion without a physician, indigent defendants need counsel to effectively present their appellate claims. This truism has been well recognized by the Supreme Court. In *Douglas v. People of State of Cal.*, 372 U.S. 353, 358, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), the Court noted that an indigent without counsel, "where the record is unclear or the errors are hidden, has only the right to a meaningless ritual." Likewise, the *Evitts v. Lucey*, 469 U.S. 387, 393, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), court emphasized that "the services of a lawyer will for virtually every layman be necessary to present an appeal in a form suitable for appellate consideration on the merits."

Thus, just as "the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against" a woman's abortion choice, *Singleton* at 117, 96 S.Ct. 2868, a criminal appellate attorney is uniquely qualified to litigate the constitutionality of an indigent defendant's denial of appointed appellate counsel.

Finally, this Court finds that the third *jus tertii* criteria is met, inasmuch as indigent defendants are severely hampered in presenting their own challenges to the Act. As noted above, virtually every lay person needs the assistance of counsel to present a suitable appeal. *Evitts* at 393, 105 S.Ct. 830. This principle surely applies when the appellate issue is the constitutionality of the trial court's denial of appointed

counsel for the filing of an application for leave to appeal.

Indeed, this case is distinguishable from *Singleton, Craig* and *Caplin* in a manner that deems the finding of *jus tertii* standing even more appropriate here. In *Singleton,* the Court found that women seeking abortions had obstacles to challenging the statute at issue but noted that those obstacles were not insurmountable. *Singleton* at 117, 96 S.Ct. 2868. In his dissenting opinion in *Craig,* Chief Justice Burger noted that "there is here no barrier whatever to Oklahoma males 18–20 years of age asserting, in an appropriate forum, any constitutional rights they may claim...." *Craig* at 216, 97 S.Ct. 451. Finally, in *Caplin,* the Court found no obstacles to a criminal defendant asserting the Sixth Amendment rights challenged in that case. *Caplin* at 624, n. 3, 109 S.Ct. 2667.

In contrast, indigent defendants denied appellate counsel face significant, insurmountable obstacles in bringing their own challenges to the Act. The lack of legal counsel has been recognized repeatedly by the Supreme Court as rendering appeals woefully ineffective, as will be discussed more fully below.

Accordingly, the Court holds that the Attorneys have standing under the doctrine of *jus tertii* to assert the due process and equal protection rights of indigent defendants who plead guilty or nolo contendere.

### B. *The Standing of the Indigents to Challenge the Act*

Plaintiffs state it is only the Attorneys who challenge the Act, and not the Indigents. Therefore, the Indigents' standing to challenge the Act is not an issue. However, in dispute is whether *Younger v. Harris* abstention and the *Rooker–Feldman* doctrine deprive the Indigents of standing to challenge the Defendants' practices.

### C. *Younger v. Harris Abstention*

In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the plaintiff was being prosecuted for violation of a California Criminal Syndicalism Act (the "CCSA") and filed an action in a federal district court to enjoin the prosecution. The district court held the CCSA unconstitutional and restrained the State from further prosecution of the plaintiff. The Supreme Court reversed. In *Zalman v. Armstrong,* 802 F.2d 199, 201–202 (6th Cir.1986), the bases for the *Younger* decision was explained as follows:

> *Younger v. Harris* counsels a federal court against interfering with currently pending state criminal proceedings absent a showing of extraordinary circumstances. Underlying this rule are considerations of equity, comity, and federalism. *Younger,* 401 U.S. at 43–45, 91 S.Ct. at 750–51. See *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 106 S.Ct. 2718, 2723; 91 L.Ed.2d 512 (1986). The equity component reflects 'the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.' *Younger,* 401 U.S. at 43–44, 91 S.Ct. at 750. The comity component reflects 'a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.' *Id.* at 44, 91 S.Ct. at 750. Finally, the federalism component reflects a 'sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.' *Id. Younger* is thus de-

signed to ' "permit state courts to try state cases free from interference by federal courts,' ... particularly where the party to the federal case may fully litigate his claim before the state court.' " *Hicks v. Miranda*, 422 U.S. 332, 349, 95 S.Ct. 2281, 2292, 45 L.Ed.2d 223 (1975) (*quoting Younger*, 401 U.S. at 43, 91 S.Ct. at 750).

■ To determine whether to abstain in a case pursuant to the *Younger* doctrine, there are three factors to consider: " (1) whether a state proceeding is pending at the time the federal action is initiated; (2) whether an adequate opportunity is provided to raise the constitutional claims in the state proceeding; and (3) whether there are extraordinary circumstances which nevertheless warrant federal intervention." *Zalman* at 202. However, the *Zalman* court cautioned against mechanical application of those factors. "Indeed, as with any 'rule of law' it is incumbent upon a court to be sensitive to the concerns which animate that rule." *Id.*

### 1. Pending State Action

Turning to the first factor, Defendants argue that the Indigents all have ongoing criminal proceedings. Plaintiffs Tesmer and Schnell have appealed to the Michigan Court of Appeals. Plaintiff Carter continues to have a right to file a delayed application for leave to appeal.[3] "For purposes of the first requirement, a state prosecution is considered to be pending if as of the filing of the federal complaint not all state appellate remedies have been exhausted." *Mounkes v. Conklin*, 922 F.Supp. 1501, 1511 (D.Kan.1996). Therefore, Defendants argue, that all of the Indigents continue to have pending state actions for purposes of the *Younger* doctrine.

Plaintiffs do not challenge Defendants' claim that Tesmer and Carter have pending State proceedings. Accordingly, the Court, finds that the first prong of the *Younger* doctrine is satisfied and absten-

tion may be required in the cases of Carter and Tesmer if the other two prongs are satisfied.

■ The Plaintiffs do dispute that Schnell has a pending action. Schnell's application for leave to appeal was denied by the Court of Appeals on April 1, 1999 and his request for rehearing was denied on May 25, 1999.

Under MCR 7.302, a delayed application for leave to appeal to the Supreme Court may not be filed more than 56 days after the Court of Appeals decision. More than 56 days have passed since the Court of Appeals denied Schnell's Motion for rehearing on May 25, 1999. Consequently, the Court finds that Plaintiff Schnell does not have a pending State action. Hence, the Court need not abstain from hearing Schnell's claim.

### 2. Adequate Opportunity to Raise Constitutional Claims in State Proceeding

Defendants cite *Moore v. Sims*, 442 U.S. 415, 425–426, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979), for the proposition that abstention is required unless a plaintiff shows that state law bars the presentation of his or her claims in the pending state action. They contend that the Indigents have an adequate opportunity to raise their constitutional claims in the State proceedings. Additionally, the Michigan Supreme Court is considering the issues raised in this action in *Bulger.*

Plaintiffs agree that Carter and Tesmer must show that state procedural law bars them from presenting their claims. However, they argue that the State law being challenged in this case precludes them from having a reasonable opportunity to present their claims. In support, they cite Supreme Court cases, such as *Evitts*, where the Court stated that "the services of a lawyer will for virtually every layman

---

**3.** Defendants state that Carter was denied appellate counsel on May 12, 1999 and that Michigan court rules allow delayed applica- tions for leave to appeal for at least 12 months following entry of a final order. MCR 7.205(F)(3) and (F)(4).

be necessary to present an appeal in a form suitable for appellate consideration on the merits." *Evitts* at 393, 105 S.Ct. 830.

Plaintiffs also rely upon *Mata v. Egeler*, 383 F.Supp. 1091 (E.D.Mich.1974). That case pertained to a Michigan court rule in which the indigent defendant had a right to appeal to the Court of Appeals and to have appointed appellate counsel if he or she filed an appeal within 60 days. However, if the indigent defendant did not appeal within 60 days, the right to appeal was lost, as was the right to appellate counsel. Thereafter, the indigent defendant had a discretionary appeal only, and no right to counsel to perfect his or her application for leave.

Judge James Harvey of this Court granted the plaintiff's application for writ of habeas corpus, reasoning in part:

'[M]eaningful access' to this system is denied indigents: they are forced to travel this route without a vehicle.... Mata has not been assisted by counsel at any stage of appeal. Until an attorney scrutinizes the record and prepares argument for appeal, the Court of Appeals does not have an 'adequate basis on which to base its decision to grant or deny review.' Although the state procedure does not completely foreclose petitioner from presenting his claims to the Michigan appellate courts, depriving him of counsel at the initial review, simply because of his indigency, will degrade the entire appellate process to a 'meaningless ritual'.

*Mata* at 1094.

The Court agrees with Plaintiffs that it is State substantive law that compromises indigent defendants' ability to receive adequate protection from the challenged practice of denying them appellate counsel. The Michigan Court of Appeals has already upheld the constitutionality of the practice of denying the appointment of appellate counsel for the purpose of preparing application for leave to appeal. *People v. Najar*, 229 Mich.App. 393, 581 N.W.2d 302 (1998). Under MCR 7.215(C)(2), "A published opinion of the Court of Appeals has precedential effect under the rule of *stare decisis*." While it is true that the mere fact that the *Najar* court's rejection of another defendant's constitutional claims does not itself suffice to establish that the Indigents are denied an adequate opportunity to present their challenge, in this case, the State law itself defeats indigent defendants' ability to adequately advance their constitutional claims through counsel.

■ This finding, however, applies only to Carter. In a declaration, he stated that he did not appeal to the Court of Appeals because he did not have a lawyer to represent him and he did not know the law (Plt's Resp. to Mot. to Dis., Exh. A). In contrast, Tesmer did file for leave to appeal. His 38 page Delayed Application for Leave to Appeal Denial of Counsel is attached as Exhibit 1 to Defendants' Motion. He and Schnell appear to be one of many indigent defendants who received the form brief (see Schnell's Br. at Dft's Mot, Exh. 2). Their briefs are identical except that the fill-in-the-blank cover and signature pages include their individual information. Tesmer's lawyerly brief undermines his claim, and this Court is satisfied that Tesmer has had an adequate opportunity to challenge the denial of appellate counsel in the state proceeding. Thus, *Younger* requires abstention in this regard.

### 3. Extraordinary Circumstances

■ Having made the above findings, Plaintiff Tesmer is the only remaining Plaintiff of the Indigents to whom the "extraordinary circumstances" analysis is meaningful. And, the Court finds that there are no extraordinary circumstances which preclude abstention under the *Younger* doctrine for Tesmer. In *Younger*, the Court cited "bad faith and harassment" and "a statute [that is] flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made

to apply it" as examples of when abstention may not be justified. *Younger* at 53–54, 91 S.Ct. 746, (citation and quotation marks omitted). Plaintiffs argue that the Act and the challenged practice of the Judges are flagrantly and patently unconstitutional. However, Plaintiffs' cite no cases which support this contention. There may be none, because the exception is interpreted to be so narrow.

The requirement that a statute must be unconstitutional in every 'clause, sentence and paragraph, and in whatever manner' it is applied, demonstrates that this exception to *Younger* abstention is very narrow. The refusal to apply the exception in the *Younger* case, itself, illustrates the narrowness of this exception: in *Younger*, the federal plaintiff could not bring himself within this exception even though the statute under which he was indicted—the California Criminal Syndicalism Act—had been effectively invalidated the previous year in *Brandenburg v. Ohio*, 395 U.S. 444, 449, 89 S.Ct. 1827, 1830, 23 L.Ed.2d 430 (1969) (*overruling Whitney v. California*, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927)). *Younger*, 401 U.S. at 40–41, 91 S.Ct. at 748–749.

*Dubinka v. Judges of Superior Court of State of Cal. for County of Los Angeles*, 23 F.3d 218, 225 (9th Cir.1994).

Further, Plaintiffs have not shown that Tesmer faces great and immediate irreparable injury, which is required in order for there to be a finding of extraordinary circumstances. *See Zalman* at 205, n. 8. The *Younger* Court stressed that requirement.

[I]n view of the fundamental policy against federal interference with state criminal prosecutions, even irreparable injury is insufficient unless it is both great and immediate. Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered irreparable in the special legal sense of that term. Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution.

*Younger* at 46, 91 S.Ct. 746.

Tesmer makes no showing that he faces threat of injury that is greater than any other criminal defendant facing prosecution who, in the context of that litigation, alleges a violation of federally protected rights. Therefore, even if the Act and practice of the Judges are flagrantly unconstitutional, extraordinary circumstances do not exist to interfere in the State court proceedings involving Tesmer.

### 4. Conclusion Regarding Younger Abstention

The Court concludes that the *Younger* doctrine does not bar the Attorneys or Schnell from pursuing this case because they do not have any pending State actions. Further, Carter has not had an adequate opportunity to challenge the practice and State law that led to the denial of his request for appellate counsel. Without counsel, Carter's appeal of that decision would have been a "meaningless ritual." Finally, no extraordinary circumstances exist which would allow the Court to interfere in the State court action pending with respect to Tesmer.

### D. *The Rooker–Feldman Doctrine*

The general rule established by *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362, (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) is that federal district courts do not have appellate jurisdiction over State court decisions. District courts are vested only with original jurisdiction. *Rooker* at 415–416, 44 S.Ct. 149; *Feldman* at 482–486, 103 S.Ct. 1303.

This rule arises from the interplay of two jurisdictional statutes: 28 U.S.C. § 1331, which grants district courts original jurisdiction over 'civil actions arising under' federal law, and 28 U.S.C. § 1257, which grants the Supreme Court the right to review 'final judgments ...

rendered by the highest court of a State.' This rules applies even when the state court judgment is not made by the highest state court, *Worldwide Church of God v. McNair,* 805 F.2d 888, 893 n. 3 (9th Cir.1986), and when the challenge to the state court's actions involves federal constitutional issues. *Feldman,* 460 U.S. at 484–86, 103 S.Ct. at 1316–17. *Dubinka v. Judges of Superior Court of State of Cal. for County of Los Angeles,* 23 F.3d 218, 221 (9th Cir.1994).

Defendants argue that, under the *Rooker–Feldman* doctrine, this Court lacks jurisdiction to review the merits of the State court decisions denying the Indigents' requests for appellate counsel.

■ There is, however, an important exception to the *Rooker–Feldman* doctrine, which was explained in *Dubinka* as follows:

> Although a federal district court does not have jurisdiction to review constitutional challenges to a state court's decision, the court does have jurisdiction over a general constitutional challenge that does not require review of a final state court decision in a particular case. [*Feldman* ] at 482–86, 103 S.Ct. at 1314–17; [Worldwide Church of God v. McNair, 805 F.2d 888, 891 (9th Cir. 1986) ]. 'This distinction between a permissible general constitutional challenge and an impermissible appeal of a state court determination may be subtle, and difficult to make.' *McNair,* 805 F.2d at 891 (citations omitted).

In analyzing whether federal district courts have jurisdiction to hear a particular constitutional challenge, we must determine whether the constitutional claims are 'inexplicably intertwined' with the state court's rulings in a particular plaintiff's state case. *Feldman,* 460 U.S. at 483–84 n. 16, 103 S.Ct. at 1315–16 n. 16 (stating that '[i]f the constitutional claims presented to a United States dis-

trict court are inextricably intertwined with the state court's denial in a ·judicial proceeding of a particular plaintiff's application for admission to the state bar, then the district court is in essence being called upon to review the state-court decision'); *see also McNair,* 805 F.2d at 892. Courts have generally concluded that claims are inextricably intertwined when the district court must scrutinize both the challenged rule and the state court's application of that rule. *Dubinka* at 221–222.

■ Here, the Indigents request that the Court consider the constitutionality of the State court's general practice of denying appellate counsel following plea-based convictions. The particularities of their cases are not at issue. While Plaintiffs in their Complaint cite the specific dates and judges who denied them appellate counsel, resolution of Plaintiffs' claims only requires the Court to scrutinize the challenged rule, not the state court's application of that rule to any individual Plaintiff's case. Plaintiffs' constitutional claims are, therefore, not inextricably intertwined with the state court's denial of appointed counsel to these Plaintiffs and the *Rooker–Feldman* doctrine does not apply. *Dubinka* at 221–222.

\*    \*    \*

Thus, the Court finds that the Attorneys have standing and, further that this Court has jurisdiction to hear the constitutional challenge brought by the Indigents. However, this holding is limited to Carter and Schnell, since the *Younger* doctrine applies to Tesmer. Finally, since the Attorneys did not have a State proceeding, the *Rooker–Feldman* doctrine does not apply to them, and they may proceed in this action.

### E. *The Proper Defendants*

Defendants argue that there are no proper Defendants in this case. They argue that the Eleventh Amendment bars suit against the Attorney General in her official capacity.[4] Nor does *Ex Parte*

---

4. Defendants also argue that the Attorney General cannot be sued in her personal capacity. This argument is not reviewed in this

memorandum because Plaintiffs filed suit against the Attorney General only in her official capacity and they do not argue in re-

*Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), apply to Plaintiffs' request for injunctive relief against the Attorney General, Defendants argue.

Under *Young*, individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action. . . .

Courts have not read *Young* expansively. *Young* does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute.

*Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1414–1415 (6th Cir.1996) (citations omitted).

■ Defendants allege that the Attorney General has no relation to the Act and will have absolutely nothing to do with enforcing it. The Court agrees with Defendants.

The enforcement of the Act is not a law enforcement or prosecutorial function. The Act is directed at the trial court. The Court sees no indication that the prosecutor has any input into the trial court's consideration of the merits of appointing counsel. The hypothetical chance that the Attorney General could file an application for superintending control over a trial court which violates the Act, as Plaintiffs suggest might happen, is far afield from the requirement that the state official being sued have threatened to enforce the challenged statute. The Attorney General is not a proper party.

■ However, the Court finds that the Judges and the putative class of Circuit Court Judges are proper Defendants. They are the State officials charged with enforcing the Act. That they will be enforcing the Act is clear; a March 28, 2000 sponse to Defendants' Motion that she is per-

amendment to Michigan Court Rules 6.302, 6.425 and 6.615 and the adoption of Michigan Court Rule 6.625, are all aimed at implementing the Act (See Exh. A of Plts' Supp. Auth.).

Whether the Judges are neutral adjudicators, as Defendant suggest, or acting in an administrative capacity, when they consider the appointment of counsel, as Plaintiffs contend, is not of any consequence for purposes of this action.

Regardless of the characterization of the role they play when denying appellate counsel to indigent defendants, the Judges are proper parties. This finding is supported by *Pulliam v. Allen*, 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984), a case with striking parallels to the instant one. In *Pulliam*, a magistrate judge jailed two defendants who could not post bail even though they were arrested for non-jailable misdemeanors. Afterwards, the defendants filed a § 1983 claim against the magistrate, seeking declaratory and injunctive relief. They claimed that the magistrate's practice of requiring bond for nonincarcerable offenses violated the due process and equal protection clauses. The trial court agreed and enjoined the practice.

On appeal to the Supreme Court, the issue concerned, in relevant part, "the scope of judicial immunity from a civil suit that seeks injunctive and declaratory relief under § 1 of the Civil Rights Act of 1871. . . ." *Pulliam* at 524, 104 S.Ct. 1970. After an exhaustive review of English and American law, the Court held that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Pulliam* at 541–542, 104 S.Ct. 1970. Moreover, the Court emphasized that § 1983 was intended to reach unconstitutional actions of judges. The Court cited *Pierson v. Ray*, 386 U.S. 547, 558–564, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), as standing for the proposition that "every Member of Congress who spoke to the issue assumed that sonally liable.

judges would be liable under § 1983." *Pulliam* at 540, 104 S.Ct. 1970.

Subsequent interpretations of the Civil Rights Acts by this Court acknowledge Congress' intent to reach unconstitutional actions by all state actors, including judges. *In Ex parte Virginia,* 100 U.S. 339, 10 Otto 339, 25 L.Ed. 676 (1879), § 4 of the Civil Rights Act of 1875, 18 Stat. 336, was employed to authorize a criminal indictment against a judge for excluding persons from jury service on account of their race. The Court reasoned that the Fourteenth Amendment prohibits a State from denying any person within its jurisdiction the equal protection of the laws. **Since a State acts only by its legislative, executive, or judicial authorities, the constitutional provision must be addressed to those authorities, including the State's judges.** Section 4 was an exercise of Congress' authority to enforce the provisions of the Fourteenth Amendment and, like the Amendment, reached unconstitutional state judicial action.

The interpretation in *Ex parte Virginia* of Congress' intent in enacting the Civil Rights Acts has not lost its force with the passage of time. In *Mitchum v. Foster,* supra, the Court found § 1983 to be an explicit exception to the anti-injunction statute, citing *Ex parte Virginia* for the proposition that the "very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'" 407 U.S. at 242, 92 S.Ct. at 2162.

Much has changed since the Civil Rights Acts were passed. It no longer is proper to assume that a state court will not act to prevent a federal constitutional deprivation or that a state judge will be implicated in that deprivation. We remain steadfast in our conclusion, nevertheless, that **Congress intended § 1983 to be an independent protec-tion for federal rights and find nothing to suggest that Congress intended to expand the common-law doctrine of judicial immunity to insulate state judges completely from federal collateral review.**

*Pulliam* at 540–541, 104 S.Ct. 1970. (emphasis supplied)

Like the jailed defendants in *Pulliam,* the Indigents are suing under § 1983, asserting that the Judges' practices violate their due process and equal protection rights. In light of *Pulliam,* Defendants' argument that the Judges are not proper Defendants in this case cannot be sustained. Furthermore, *Pulliam's* emphasis on the fact that § 1983 was intended to be an independent protection for federal rights undermines Defendants' claim that an indigent defendant's only recourse is to appeal the denial of appellate counsel and, when those appeals are exhausted, file a petition for writ of habeas corpus.

In addition, the Court believes that the Judges are proper Defendants because of their role as enforcers of a common law rule which precludes indigent defendants from being assigned appellate counsel after plea based-convictions, and as enforcers of the Act, soon to take effect. The Supreme Court has held that, when judges act as enforcers, they are subject to § 1983 suits for injunctive or declaratory relief.

If the sole basis for appellees' § 1983 action against the Virginia Court and its chief justice were the issuance of, or failure to amend, the challenged rules, legislative immunity would foreclose suit against appellants. As has been pointed out, however, the Virginia Court performs more than a legislative role with respect to the State Bar Code. It also hears appeals from lower court decisions in disciplinary cases, a traditional adjudicative task; and in addition, it has independent enforcement authority of its own.

Adhering to the doctrine of *Bradley v. Fisher,* 80 U.S. 335, 13 Wall. 335, 20

L.Ed. 646 (1871), we have held that judges defending against § 1983 actions enjoy absolute immunity from damages liability for acts performed in their judicial capacities. However, we have never held that judicial immunity absolutely insulates judges from declaratory or injunctive relief with respect to their judicial acts. The Courts of Appeals appear to be divided on the question whether judicial immunity bars declaratory or injunctive relief; we have not addressed the question.

We need not decide whether judicial immunity would bar prospective relief, for we believe that the Virginia Court and its chief justice properly were held liable in their enforcement capacities. As already indicated, § 54–74 gives the Virginia Court independent authority of its own to initiate proceedings against attorneys. For this reason the Virginia Court and its members were proper defendants in a suit for declaratory and injunctive relief, just as other enforcement officers and agencies were.

Prosecutors enjoy absolute immunity from damages liability, but they are natural targets for § 1983 injunctive suits since they are the state officers who are threatening to enforce and who are enforcing the law. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), is only one of a myriad of such cases since *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), decided that suits against state officials in federal courts are not barred by the Eleventh Amendment. If prosecutors and law enforcement personnel cannot be proceeded against for declaratory relief, putative plaintiffs would have to await the institution of state-court proceedings against them in order to assert their federal constitutional claims. This is not the way the law has developed, and, because of its own inherent and statutory enforcement powers, immunity does not shield the Virginia Court and its chief justice from suit in this case. *Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 734–737,

100 S.Ct. 1967, 64 L.Ed.2d 641 (1980) (citations omitted).

Under the Act, Michigan's circuit court judges will be solely responsible for enforcing the laws regarding the appointment of appellate counsel to indigent defendants who have pled guilty or nolo contendre. If the circuit court judges cannot be sued for relief, putative Plaintiffs would have to await the institution of state-court proceedings against them and the denial of appellate counsel in order to assert their federal constitutional claims. "This is not the way the law has developed, and, because of [their] own inherent and statutory enforcement powers, immunity does not shield the [the Judges] from suit in this case." *Supreme Court of Virginia* at 737, 100 S.Ct. 1967.

Accordingly, the Court holds that the Judges and the putative class of Michigan circuit court judges are proper Defendants in this case.

### F. *Available Relief Against the Judges*

■ In this 42 USC § action Plaintiffs' request both declaratory and injunctive relief. However, injunctive relief against the Judges is not available. Following the decision in *Pulliam*, § 1983 was amended to provide that, "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." Since no declaratory decree has been violated and declaratory relief is available, the Court cannot enter an injunction against the Judges. However, under the plain wording of 42 USC § 1983, declaratory relief against judicial officers is clearly available if the circumstances warrant such relief.

### G. *Declaratory Judgment*

■ The Court finds that both the challenged practice of denying appellate counsel to indigent defendants who plead

guilty or nolo contendere, as well as the Act, violate the United States Constitution.

The Supreme Court has held that denial of counsel on appeal to an indigent amounts to invidious discrimination. The starting point of the analysis was the Court's finding that "[a] State may not grant appellate review in such a way as to discriminate against some convicted defendants on account of their poverty." *Douglas v. People of State of Cal.*, 372 U.S. 353, 354, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). Applying that general rule, the Court found that "there can be no equal justice where the kind of an appeal a man enjoys depends on the amount of money he has." *Id.*, (citation and quotation marks omitted).

In *Douglas,* the State court denied the defendants' requests for counsel after determining that no good would be served by the appointment of counsel. The state court acted pursuant to a State statute that allowed the court to review the record and determine whether appellate counsel would be helpful. The Supreme Court rejected that approach.

> In spite of California's forward treatment of indigents, under its present practice the type of an appeal a person is afforded in the District Court of Appeal hinges upon whether or not he can pay for the assistance of counsel. If he can the appellate court passes on the merits of his case only after having the full benefit of written briefs and oral argument by counsel. If he cannot the appellate court is forced to prejudge the merits before it can even determine whether counsel should be provided. At this stage in the proceedings only the barren record speaks for the indigent, and, unless the printed pages show that an injustice has been committed, he is forced to go without a champion on appeal. Any real chance he may have had of showing that his appeal has hidden merit is deprived him when the court decides on an *ex parte* examination of the record that the assistance of counsel is not required.

> We are not here concerned with problems that might arise from the denial of counsel for the preparation of a petition for discretionary or mandatory review beyond the stage in the appellate process at which the claims have once been presented by a lawyer and passed upon by an appellate court. We are dealing only with the first appeal, granted as a matter of right to rich and poor alike (Cal.Penal Code §§ 1235, 1237), from a criminal conviction. We need not now decide whether California would have to provide counsel for an indigent seeking a discretionary hearing from the California Supreme Court after the District Court of Appeal had sustained his conviction (see Cal. Const., Art. VI, § 4c; Cal.Rules on Appeal, Rules 28, 29), or whether counsel must be appointed for an indigent seeking review of an appellate affirmance of his conviction in this Court by appeal as of right or by petition for a writ of certiorari which lies within the Court's discretion. But it is appropriate to observe that a State can, consistently with the Fourteenth Amendment, provide for differences so long as the result does not amount to a denial of due process or an 'invidious discrimination.' Absolute equality is not required; lines can be and are drawn and we often sustain them. But where the merits of the one and only appeal an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor.

*Douglas* at 355–357, 83 S.Ct. 814, (citations omitted).

The *Douglas* court further emphasized that an indigent who is required to defend himself is rendered utterly defenseless.

> There is lacking that equality demanded by the Fourteenth Amendment where the rich man, who appeals as of right, enjoys the benefit of counsel's examination into the record, research of the law, and marshalling of arguments on his behalf, while the indigent, already bur-

dened by a preliminary determination that his case is without merit, is forced to shift for himself. The indigent, where the record is unclear or the errors are hidden, has only the right to a meaningless ritual, while the rich man has a meaningful appeal.

*Douglas* at 357–358, 83 S.Ct. 814.

The *Douglas* decision was followed by *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). The *Ross* court distinguished its case from *Douglas* and held that North Carolina was not required to appoint counsel to file a discretionary appeal to the State's highest court or to the U.S. Supreme Court. In so holding, the Court emphasized in three instances that the defendants in that State were appointed counsel for their appeals to the intermediate appellate court.

> The facts show that respondent, in connection with his Mecklenburg County conviction, received the benefit of counsel in examining the record of his trial and in preparing an appellate brief on his behalf for the state Court of Appeals. Thus, prior to his seeking discretionary review in the State Supreme Court, his claims had 'once been presented by a lawyer and passed upon by an appellate court.' *Douglas v. California*, 372 U.S. at 356, 83 S.Ct. at 816. We do not believe that it can be said, therefore, that a defendant in respondent's circumstances is denied meaningful access to the North Carolina Supreme Court simply because the State does not appoint counsel to aid him in seeking review in that court. At that stage he will have, at the very least, a transcript or other record of trial proceedings, a brief on his behalf in the Court of Appeals setting forth his claims of error, and in many cases an opinion by the Court of Appeals disposing of his case. These materials, supplemented by whatever submission respondent may make pro se, would appear to provide the Supreme Court of

North Carolina with an adequate basis for its decision to grant or deny review.

*Ross* at 614–615, 94 S.Ct. 2437.

> Once a defendant's claims of error are organized and presented in a lawyerlike fashion to the Court of Appeals, the justices of the Supreme Court of North Carolina who make the decision to grant or deny discretionary review should be able to ascertain whether his case satisfies the standards established by the legislature for such review.

*Id.* at 615, 94 S.Ct. 2437.

> An indigent defendant seeking review in the Supreme Court of North Carolina is therefore somewhat handicapped in comparison with a wealthy defendant who has counsel assisting him in every conceivable manner at every stage in the proceeding. But both the opportunity to have counsel prepare an initial brief in the Court of Appeals and the nature of discretionary review in the Supreme Court of North Carolina make this relative handicap far less than the handicap borne by the indigent defendant denied counsel on his initial appeal as of right in *Douglas*.

*Id.* at 616, 94 S.Ct. 2437.

In *Mata, supra*, discussed earlier, this court applied *Douglas* and *Ross* to hold a portion of Michigan's then existing appellate rules unconstitutional. The rules deemed first appeals to the Court of Appeals to be as of right so long as they were requested within 60 days. Indigent defendants who timely filed requests for appeal were entitled to the appointment of appellate counsel. Anyone failing to request appeal within 60 days lost his or her right to appeal but could file for leave to appeal. Additionally, the right to appointed appellate counsel for indigents was lost when the request for appeal was untimely. The *Mata* petitioner did not file his request to appeal timely and, therefore, his request for appointed appellate counsel was denied.

Despite the fact that the petitioner's appeal to the Court of Appeals was discretionary, the *Mata* court distinguished its case from *Ross*. Unlike in *Ross*, where the defendants had already received appellate counsel during the intermediate appeal, the *Mata* petitioner had "not received the assistance of counsel at any stage of the appellate process." *Mata* at 1093. No attorney had scrutinized the record and prepared an argument for appeal. *Mata* at 1094. The court continued:

> It is 'invidious discrimination' for the Michigan Court of Appeals to consider the merits of an indigent's first late appeal without benefit of counsel while allowing a rich man to employ counsel. The 'relative handicap' Michigan indigents face when applying for leave to appeal is even greater than the handicap petitioners faced in *Douglas*. There, the California appellate court independently examined the record before concluding that 'no good whatever could be served by appointment of counsel.' 372 U.S. at 355, 83 S.Ct. at 815. Here, the only person examining the record for possible errors is petitioner—an indigent untrained in law. Furthermore, Mata's appeal is discretionary rather than as of right; if he fails to persuade the Court of Appeals his case has merit, he will not receive his first appeal, as petitioners in *Douglas* would have. **While one can distinguish the principal case from *Douglas* —the appeal in the principal case is discretionary, whereas in Douglas it was as of right—in the context of the Michigan appellate system, this is a distinction without a difference.** Whether the appeal is as of right or discretionary is irrelevant if 'indigents are ... denied meaningful access to that system because of their poverty.' *Ross v. Moffitt*, 417 U.S. at 611, 94 S.Ct. at 2444, 41 L.Ed.2d at 351.

*Mata* at 1093–1094. (emphasis supplied)

Consistently with the *Mata* court, the Court holds that the practice of the Judges and similarly situated judicial officers, which denies appellate counsel to indigent defendants with plea-based convictions, is unconstitutional. Such practice, codified in the Act slated to soon take effect, is unconstitutional for the same reasons. Defendants emphasize that the *Douglas* and *Ross* Courts distinguished between appeals of right and discretionary appeals. However, in holding that a State need not appoint appellate counsel for a discretionary appeal to the State's highest court, the Supreme Court could not have been more clear that that distinction was based upon the fact that an attorney had been appointed at the intermediate level, had reviewed the record and had prepared the appellate arguments. Without that initial review by an attorney, the indigent defendant's appeal was a meaningless ritual.

The Supreme Court also made clear in *Douglas* and *Ross* that, when a rich man is given a meaningful opportunity to appeal while a poor man is given only a meaningless ritual, that is invidious discrimination.

Defendants stress the fact that the indigent defendants who are denied appellate counsel have pled guilty. The implication is that, by admitting guilt, the indigent defendants do not need to have a meaningful appeal available to them. The Court rejects this argument. An illustration of the serious injustice that could occur when an indigent defendant who has pled guilty is denied appellate counsel was described in *Mata*.

> At the Center for Forensic Psychiatry in Ann Arbor, Michigan, three doctors examined Mata for nearly two months before concluding he was incompetent to stand trial. Despite this report, the trial judge accepted a local doctor's conclusion of competence that was based on an hour and fifty-minute interview with Mata. In addition to maintaining he was incompetent to stand trial, petitioner argues with some force that he received incompetent assistance of counsel. Assuming *arguendo* these contentions have merit, petitioner's only chance for justice

within the Michigan legal system rests on his obtaining an effective appeal.

*Mata* at 1094.

Therefore, the fact that the indigent criminal defendants at issue have or will have pled guilty or nolo contendere does not justify the policy of denying them a meaningful appeal.

### IV. *Conclusion*

For the above reasons, the Court finds that the attorneys have established *jus tertii* standing; that *Younger* requires abstention with respect to Tesmer's claim only, and not the other Indigents or the Attorneys; that the *Rooker–Feldman* doctrine is applicable; that the Attorney General is not a proper Defendant, but the Judges and the putative class of circuit court judges are. These findings result in Defendants' Motion to Dismiss being granted in part and denied in part.

Further, for the reasons stated above, this Court is prohibited from enjoining the Judges and the putative class of circuit court judges by operation of § 1983. Hence, Plaintiffs' Motion for Preliminary Injunction is denied.

Finally, this is a proper case for entry of a Declaratory Judgment under Fed. R.Civ.P. 57 and 28 U.S.C. § 2201. Accordingly:

1. The practice of the Judges and other similarly situated State of Michigan circuit court judges, of denying appointed counsel to aid indigents seeking leave to appeal their plea-based felony conviction or nolo contendere, is declared to be in violation of equal protection and due process requirements of the United States Constitution; and

2. P.A.1999, No. 200, which codifies the above practice, is declared to be in violation of equal protection and due

process requirements of the United States Constitution.

**IT IS SO ORDERED.**