WILLIAM PRYOR, Circuit Judge,
joined by HULL, Circuit Judge, concurring:
I concur in the majority opinion, but I write separately to reiterate that our decision is about the First Amendment, not the Second. The Second Amendment “guarantee[s] the individual right to possess and carry weapons,” District of Columbia v. Heller, 554 U.S. 570, 592, 128 S.Ct. 2783 (2008), and enshrines a fundamental right “necessary to our system of ordered liberty” that applies to the states through the Fourteenth Amendment. McDonald v. City of Chicago, 561 U.S. 742, 778, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). Our decision recognizes that protecting that fundamental right also serves a substantial government interest. Majority Op. at 1312. And for that reason, Florida can protect its citizens from discrimination on the basis of them exercise of their right to bear arms. Majority Op. at 1317-18. But the profound importance of the Second Amendment does not give the government license to violate the right to free speech under the First Amendment.
“[Ajbove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.” Police Dep’t of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Content-based regulations of speech “pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion.” Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641, 114 S.Ct. 2445 (1994). The power of the state must not be used to “drive certain ideas or viewpoints from the marketplace,” even if a majority of the people might like to see a particular idea defeated. Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd., 502 U.S. 105, 116, 112 S.Ct. 501 (1991).
The First Amendment is a counter-ma-joritarian bulwark against tyranny. “Congress shall make no law ... abridging the freedom of speech,” U.S. Const. Amend. I, cannot mean “Congress shall make no law abridging the freedom of speech a majority likes.” No person is always in the majority, and our Constitution places out of reach of the tyranny of the majority the protections of the First Amendment. The promise of free speech is that even when one holds an unpopular point of view, the state cannot stifle it. The price Americans pay for this freedom is that the rule remains unchanged regardless of who is in the majority. “He that would make his own liberty secure must guard even his enemy from oppression; for if he violates this duty, he establishes a precedent that will reach to himself.” Thomas Paine, Dissertation on First-Principles of Government 37 (1795).
We would resolve this appeal in exactly the same way if the facts were reversed. Suppose doctors were inspired to ask patients about gun ownership because the doctors believed that possession of firearms is an important means of ensuring *1328 health and safety. One can easily imagine circumstances in which a medical professional might justifiably encourage a patient (or a third party) in a dangerous situation to take measures to protect herself. In fact, following Tarasoff v. Regents of University of California, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), almost every state took action to require or allow mental health professionals to warn third parties of patients’ threats to their safety. See Mental Health Professionals’ Duty to Warn, National Conference of State Legislatures (Sept. 28, 2015), http://www.ncsl. org/research/health/mental-health-professionals-duty-to-warn.aspx. A state legislature motivated by anti-gun sentiment might have passed the same inquiry, record-keeping, and anti-harassment provisions that are in the Firearm Owners’ Privacy Act to prevent doctors from encouraging their patients to own firearms, and those laws would be equally unconstitutional. The First Amendment does not discriminate on the basis of motivation or viewpoint — the principle that protects pro-gun speech protects anti-gun speech with equal vigor.
That the Act focuses on doctors is irrelevant. The need to prevent the government from picking ideological winners and losers is as important in medicine as it is in any other context. See Thomas v. Collins, 323 U.S. 516, 544, 65 S.Ct. 315 (1945) (Jackson, J., concurring) (“I do not think [the state] could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought.”). The history of content-based restrictions on physicians’ speech provides a cautionary tale:
During certain historical periods, ... governments have overtly politicized the practice of medicine, restricting access to medical information and directly manipulating the content of doctor-patient discourse. For example, during the Cultural Revolution, Chinese physicians were dispatched to the countryside to convince peasants to use contraception. In the 1930s, the Soviet government expedited completion of a construction project on the Siberian railroad by ordering doctors to both reject requests for medical leave from work and conceal this government order from their patients. In Nazi Germany, the Third Reich systematically violated the separation between state ideology and medical discourse. German physicians were taught that they owed a higher duty to the “health of the Volk” than to the health of individual patients. Recently, Nicolae Ceausescu’s strategy to increase the Romanian birth rate included prohibitions against giving advice to patients about the use of birth control devices and disseminating information about the use of condoms as a means of preventing the transmission of AIDS.
Paula Berg, Toward a First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice, 74 B.U. L. Rev. 201, 201-02 (1994) (footnotes omitted). Health-related information is more important than most topics because it affects matters of life and death. Doctors help patients make deeply personal decisions, and their candor is crucial. If anything, the doctor-patient relationship provides more justification for free speech, not less.
If we upheld the Act, we could set a precedent for many other restrictions of potentially unpopular speech. Think of everything the government might seek to ban between doctor and patient as supposedly “irrelevant” to the practice of medicine. Without the protection of free speech, *1329 the government might seek to ban discussion of religion between doctor and patient. The state could stop a surgeon from praying with his patient before surgery or punish a Christian doctor for asking patients if they have accepted Jesus Christ as their Lord and Savior or punish an atheist for telling his patient that religious belief is delusional. Without the protection of free speech, the government might seek to censor political speech by doctors. The state might prevent doctors from encouraging their patients to vote in favor of universal health care or prohibit a physician from criticizing the Affordable Care Act. Some might argue that such topics are irrelevant to a particular patient’s immediate medical needs, but the First Amendment ensures that doctors cannot be threatened with state punishment for speech even if it goes beyond diagnosis and treatment.
These examples do not even begin to address the number of highly controversial topics that doctors discuss as a direct part of their medical responsibilities. Could a state prohibit a pro-life doctor from discouraging a patient from aborting her unborn child? Could a state prohibit a doctor from advising a patient about sex-reassignment surgery? Could a state prohibit a doctor from advising parents to vaccinate their children? Could a state prohibit a doctor from recommending abstinence or encouraging safe sexual behavior? What about organ donation or surrogacy or terminal care? What about drugs or alcohol or tobacco? Could a state legislature prevent a doctor from explaining the risks or benefits of a vegan diet? Or prevent a doctor from explaining the risks or benefits of playing football? This type of thought experiment should give us pause. If today the majority can censor so-called “heresy,” then tomorrow a new majority can censor what was yesterday so-called “orthodoxy.”
We should not be swayed by the argument that the First Amendment may be curtailed when other constitutional rights need “protection.” In this context, “protection” is a misnomer. The Constitution protects individual rights from government infringement, but freedom thrives on private persuasion. That the government may not establish a religion, U.S. Const. Amend. I., or ban handguns, U.S. Const. Amend. II, does not suggest that private individuals may not start a church or give away their guns. The Second Amendment is not infringed when private actors argue that guns are dangerous any more than when private actors support the positions of the National Rifle Association. The “theory of our Constitution” is that “the best test of truth is the power of the thought to get itself accepted in the competition of the market.” Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). The Florida Legislature overstepped the boundaries of the First Amendment when it determined that the proper remedy for speech it considered “evil” was “enforced silence,” as opposed to “more speech.” Whitney v. California, 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J.,. concurring).
And we should keep in mind that the Second Amendment is not the only constitutional right that might receive such “protection” at the expense of the freedom of speech. If we say that we must “place the doctors’ right to question their patients on the scales against the State’s compelling interest in fully effecting the guarantees of the Second Amendment,” Wollschlaeger v. Governor of the State of Fla. (Wollschlaeger IV), 814 F.3d 1159, 1200 (11th Cir. *1330 2015) reh’g en banc granted, opinion vacated, 649 Fed.Appx. 647 (11th Cir. 2016), others can say that “[w]e must place students’ right to express” unpopular views about race, religion, or sex “against the State’s compelling interest in fully effecting the guarantees of the Equal Protection Clause.” Eugene Volokh, Can Florida Restrict Doctors’ Speech to Patients About Guns?, Wash. Post (Feb. 4, 2016), https:// www.washingtonpost.com/news/volokh-conspiracy/wp/2016/02/04/ean-florida-restrict-doctors-speeeh-to-patients-about-guns. The precedent that would allow the government to restrict speech any time its officials can identify a different right they believe more important is dangerous indeed.
“If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion .... ” W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (Jackson, J.). Our decision applies this timeless principle to speech between doctors and patients, regardless of the content. The First Amendment requires the protection of ideas that some people might find distasteful because tomorrow the tables might be turned.