# SUPREME COURT OF THE UNITED STATES

## ARIZONA, ET AL. *v.* ALEJANDRO MAYORKAS, SECRETARY OF HOMELAND SECURITY, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

#### No. 22–592.   Decided May 18, 2023

The December 16, 2022 order of the United States Court of Appeals for the District of Columbia Circuit denying petitioners' motion to intervene is vacated, and the case is remanded to that court with instructions to dismiss the motion as moot.

JUSTICE JACKSON dissents from the vacatur of the order of the United States Court of Appeals for the District of Columbia Circuit and would instead dismiss the writ of certiorari as improvidently granted.

Statement of JUSTICE GORSUCH.

This case concerns the "Title 42 orders." Those emergency decrees severely restricted immigration to this country for the ostensible purpose of preventing the spread of COVID–19. The federal government began issuing the orders in March 2020 and continued issuing them until April 2022, when officials decided they were no longer necessary.[1]

If that seems reasonable enough, events soon took a turn. In a federal district court in Louisiana, a number of States argued that the government's decision to end the Title 42 orders violated the Administrative Procedure Act (APA), 5 U. S. C. §551 *et seq.*, because agency officials had not provided advance notice of their decision or invited public comment.[2] The States did not seriously dispute that the public-

-------

[1] 87 Fed. Reg. 19944–19946, 19956 (2022).

[2] *Louisiana* v. *Centers for Disease Control & Prevention*, 603 F. Supp. 3d 406, 412 (WD La. 2022).

health justification for the orders had lapsed. The States also understood that their lawsuit would only require the government to take certain additional procedural steps before ending the Title 42 orders. But the States apparently calculated that even a short, court-ordered extension of those decrees was worth the fight. Worth it because, in their judgment, a new and different crisis had emerged at the border and the federal government had done too little to address it.[3] Keeping the Title 42 orders in place even temporarily was better than the alternative. In the end, the district court agreed with the States' APA arguments and entered a nationwide injunction that effectively required the government to enforce the Title 42 orders until and unless it complied with the statute's notice-and-comment procedures.[4]

Meanwhile, a thousand miles away, a group of asylum seekers filed a competing class-action lawsuit in a federal district court in Washington, D. C. This group argued that, from the start, the government lacked legal authority to issue its Title 42 orders. Ultimately, the D. C. district court agreed with the group's assessment and issued an equally sweeping form of relief—sometimes called "universal vacatur"—that purported to wipe the Title 42 orders off the books as if they never existed.[5] So it is that the federal government found itself in an unenviable spot—bound by two inconsistent nationwide commands, one requiring it to enforce the Title 42 orders and another practically forbidding it from doing so.

If these head-spinning developments were not enough, more followed. Displeased with the D. C. district court's ruling, some of the States in the Louisiana case moved to intervene in the D. C. case. The States said they wanted to

—————————
[3] *Id.*, at 417.
[4] *Id.*, at 441.
[5] *Huisha-Huisha* v. *Mayorkas*, 2022 WL 16948610, *15 (Nov. 15, 2022).

defend the Title 42 orders on appeal because the federal government was unlikely to do so with sufficient vigor. Ultimately, the court of appeals denied the States' motion to intervene as untimely.[6] So, late in 2022, the States turned to this Court seeking two things. First, they asked for expedited review of the appellate court's order denying their motion to intervene. Second, they asked for a stay of the D. C. district court's decree vacating the Title 42 orders. The Court granted both requests. In doing so, the Court effectively extended the Title 42 orders indefinitely.[7]

Now, almost five months later, the Court puts a final twist on the tale. It vacates the appellate court's order denying the States' motion to intervene and remands with instructions to dismiss the motion as moot. Why the sudden about-face? Recently, Congress passed and the President signed into law a joint resolution declaring that the COVID–19 emergency is over.[8] The Secretary of Health and Human Services, too, has issued his own directive announcing the end of the public-health emergency underlying the Title 42 orders.[9] Apparently, these developments are enough to persuade the Court that the Title 42 orders the government wished to withdraw a year ago are now as good as gone and any dispute over them is moot.

I recite all this tortured procedural history not because I think the Court's decision today is wrong. Nearly five months ago, I argued that the Court erred when it granted expedited review and issued a stay. As I explained at the time, I do not discount the States' concerns about what is happening at the border, but "the current border crisis is

———————

[6] *Arizona* v. *Mayorkas*, 598 U. S. \_\_\_, \_\_\_ (2022) (GORSUCH, J., dissenting) (slip op., at 2).

[7] See *id.,* at \_\_\_ (slip op., at 3).

[8] Pub. L. 118–3, 137 Stat. 6.

[9] See U. S. Dept. of Health and Human Services, COVID–19 Public Health Emergency (PHE), https://www.hhs.gov/coronavirus/covid-19-public-health-emergency/index.html.

not a COVID crisis."[10]  And the Court took a serious misstep when it effectively allowed nonparties to this case to manipulate our docket to prolong an emergency decree designed for one crisis in order to address an entirely different one.[11] Today's dismissal goes some way to correcting that error.

I lay out the history of this case only because it is so typical.  Not just as an illustration of the quandaries that can follow when district courts award nationwide relief, a problem I have written about before.[12]  Even more importantly, the history of this case illustrates the disruption we have experienced over the last three years in how our laws are made and our freedoms observed.

Since March 2020, we may have experienced the greatest intrusions on civil liberties in the peacetime history of this country.  Executive officials across the country issued emergency decrees on a breathtaking scale.  Governors and local leaders imposed lockdown orders forcing people to remain in their homes.[13]  They shuttered businesses and schools,

––––––––––

[10] *Arizona*, 598 U. S., at ___ (GORSUCH, J., dissenting) (slip op., at 3).

[11] *Id.*, at ___–___ (slip op., at 2–3).

[12] *Department of Homeland Security* v. *New York*, 589 U. S. ___, ___ (2020) (opinion concurring in grant of stay) (slip op., at 3).

[13] See, *e.g., Republican National Committee* v. *Democratic National Committee*, 589 U. S. ___, ___ (2020) (Ginsburg, J., dissenting) (slip op., at 2) (noting that the Governor of Wisconsin ordered residents "to stay at home . . . to slow the spread of the disease"); see generally The Council of State Governments, COVID–19 Resources for State Leaders: 2020–2021 Executive Orders, https://web.csg.org/covid19/executive-orders/ (COVID–19 Resources for State Leaders) (cataloging such orders issued throughout the country).

public and private.[14] They closed churches even as they allowed casinos and other favored businesses to carry on.[15] They threatened violators not just with civil penalties but with criminal sanctions too.[16] They surveilled church parking lots, recorded license plates, and issued notices warning that attendance at even outdoor services satisfying all state social-distancing and hygiene requirements could amount to criminal conduct.[17] They divided cities and neighborhoods into color-coded zones, forced individuals to fight for their freedoms in court on emergency timetables, and then changed their color-coded schemes when defeat in court seemed imminent.[18]

Federal executive officials entered the act too. Not just with emergency immigration decrees. They deployed a public-health agency to regulate landlord-tenant relations nationwide.[19] They used a workplace-safety agency to issue a vaccination mandate for most working Americans.[20] They

---

[14] See, *e.g., Rossi* v. *Arch Ins. Co.*, 60 F. 4th 1189, 1192 (CA8 2023) (noting that "state and local governments" across the country issued "stay-at-home orders" that shuttered businesses); *Kentucky ex rel. Danville Christian Academy, Inc.* v. *Beshear*, 981 F. 3d 505, 507 (CA6 2020) (noting that the Governor of Kentucky prohibited "in-person instruction at all public and private elementary and secondary schools"); see generally COVID–19 Resources for State Leaders.

[15] *Calvary Chapel Dayton Valley* v. *Sisolak*, 591 U. S. \_\_\_, \_\_\_ (2020) (GORSUCH, J., dissenting from denial of application for injunctive relief) (slip op., at 1).

[16] See, *e.g.,* D. Burke, Police Arrest Florida Pastor for Holding Church Services Despite Stay-at-Home Order, CNN (Mar. 30, 2020), https://www.cnn.com/2020/03/30/us/florida-pastor-arrested-river-church/index.html.

[17] *Roberts* v. *Neace*, 958 F. 3d 409, 412 (CA6 2020) (*per curiam*).

[18] *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 592 U. S. \_\_\_, \_\_\_–\_\_\_ (2020) (*per curiam*) (slip op., at 1–7); see also *South Bay United Pentecostal Church* v. *Newsom*, 592 U. S. \_\_\_, \_\_\_–\_\_\_ (2021) (statement of GORSUCH, J.) (slip op., at 1–6).

[19] *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. \_\_\_, \_\_\_ (2021) (*per curiam*) (slip op., at 1).

[20] *National Federation of Independent Business* v. *OSHA*, 595 U. S. \_\_\_, \_\_\_ (2022) (slip op., at 1).

threatened to fire noncompliant employees,[21] and warned that service members who refused to vaccinate might face dishonorable discharge and confinement.[22] Along the way, it seems federal officials may have pressured social-media companies to suppress information about pandemic policies with which they disagreed.[23]

While executive officials issued new emergency decrees at a furious pace, state legislatures and Congress—the bodies normally responsible for adopting our laws—too often fell silent. Courts bound to protect our liberties addressed a few—but hardly all—of the intrusions upon them. In some cases, like this one, courts even allowed themselves to be used to perpetuate emergency public-health decrees for collateral purposes, itself a form of emergency-lawmaking-by-litigation.

Doubtless, many lessons can be learned from this chapter in our history, and hopefully serious efforts will be made to study it. One lesson might be this: Fear and the desire for safety are powerful forces. They can lead to a clamor for action—almost any action—as long as someone does something to address a perceived threat. A leader or an expert who claims he can fix everything, if only we do exactly as he says, can prove an irresistible force. We do not need to confront a bayonet, we need only a nudge, before we willingly abandon the nicety of requiring laws to be adopted by our legislative representatives and accept rule by decree. Along the way, we will accede to the loss of many cherished civil liberties—the right to worship freely, to debate public

_____

[21] See, *e.g.,* K. Liptak & K. Collins, Biden Announces New Vaccine Mandates that Could Cover 100 Million Americans, CNN (Sept. 9, 2021), https://www.cnn.com/2021/09/09/politics/joe-biden-covid-speech/index.html.

[22] *Austin* v. *U. S. Navy Seals 1–26*, 595 U. S. ___, ___ (2022) (ALITO, J., dissenting) (slip op., at 1).

[23] See, *e.g.,* S. Myers, Free Speech vs. Disinformation Comes to a Head, N. Y. Times (Feb. 9, 2023), https://www.nytimes.com/2023/02/09/business/free-speech-social-media-lawsuit.html.

policy without censorship, to gather with friends and family, or simply to leave our homes. We may even cheer on those who ask us to disregard our normal lawmaking processes and forfeit our personal freedoms. Of course, this is no new story. Even the ancients warned that democracies can degenerate toward autocracy in the face of fear.[24]

But maybe we have learned another lesson too. The concentration of power in the hands of so few may be efficient and sometimes popular. But it does not tend toward sound government. However wise one person or his advisors may be, that is no substitute for the wisdom of the whole of the American people that can be tapped in the legislative process.[25] Decisions produced by those who indulge no criticism are rarely as good as those produced after robust and uncensored debate.[26] Decisions announced on the fly are rarely as wise as those that come after careful deliberation. Decisions made by a few often yield unintended consequences that may be avoided when more are consulted. Autocracies have always suffered these defects. Maybe, hopefully, we have relearned these lessons too.

In the 1970s, Congress studied the use of emergency decrees.[27] It observed that they can allow executive authorities to tap into extraordinary powers.[28] Congress also observed that emergency decrees have a habit of long outliving the crises that generate them; some federal emer-

―――――――

[24] See, *e.g.,* Aristotle's Politics, Bk. V, chs. 2, 4 (H. Rackham transl. 1959).

[25] See, *e.g.,* The Federalist No. 10, pp. 80–84 (C. Rossiter ed. 1961) (J. Madison); *id.*, No. 35, at 215–216 (A. Hamilton); *id.*, No. 57, at 350–356 (J. Madison).

[26] Cf. *Whitney* v. *California*, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring).

[27] Congressional Research Service, National Emergency Powers 7 (Nov. 19, 2021) (CRS) (describing congressional studies undertaken from 1972 to 1976 regarding emergency powers).

[28] *Id.*, at 8.

gency proclamations, Congress noted, had remained in effect for years or decades after the emergency in question had passed.[29] At the same time, Congress recognized that quick unilateral executive action is sometimes necessary and permitted in our constitutional order.[30] In an effort to balance these considerations and ensure a more normal operation of our laws and a firmer protection of our liberties, Congress adopted a number of new guardrails in the National Emergencies Act.[31]

Despite that law, the number of declared emergencies has only grown in the ensuing years.[32] And it is hard not to wonder whether, after nearly a half century and in light of our Nation's recent experience, another look is warranted. It is hard not to wonder, too, whether state legislatures might profitably reexamine the proper scope of emergency executive powers at the state level. At the very least, one can hope that the Judiciary will not soon again allow itself to be part of the problem by permitting litigants to manipulate our docket to perpetuate a decree designed for one emergency to address another. Make no mistake—decisive executive action is sometimes necessary and appropriate. But if emergency decrees promise to solve some problems, they threaten to generate others. And rule by indefinite emergency edict risks leaving all of us with a shell of a democracy and civil liberties just as hollow.

---

[29] *Id.,* at 7.

[30] *Id.,* at 1*,* 8–10.

[31] 90 Stat. 1255 (codified at 50 U. S. C. §§1601–1651).

[32] CRS 12 (identifying dozens of existing emergencies as of 2019).